# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

ISMAEL DIAZ-CASTANEDA,
              *Defendant-Appellant.*

No. 06-30047

D.C. No.
CR-04-00381-MFM

OPINION

Appeal from the United States District Court
for the District of Oregon
Malcolm F. Marsh, District Judge, Presiding

Argued and Submitted November 17, 2006
Submission Withdrawn February 20, 2007
Resubmitted July 9, 2007
Portland, Oregon

Filed July 18, 2007

Before: Alfred T. Goodwin, Raymond C. Fisher and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Laura Graser, Portland, Oregon, for the defendant-appellant.

Baron C. Sheldahl, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

**OPINION**

FISHER, Circuit Judge:

We are presented with a question this court has not yet resolved: Does a license plate check by a law enforcement officer that reveals information about a person's car ownership, driver status and criminal record constitute a search under the Fourth Amendment? We agree with all the other courts that have considered the issue that it does not. We therefore hold that Defendant Ismael Diaz-Castaneda's Fourth Amendment rights were not violated when a Clackamas County Deputy Sheriff stopped the truck in which Diaz-Castaneda was a passenger, asked him for identification and checked his driver's license or Oregon identification card with radio dispatch. Accordingly, we affirm the district court's denial of Diaz-Castaneda's motion to suppress.

## I.  Background

On the morning of August 27, 2004, Deputy Sheriff Brad Helzer ran a computer check of the license plate on a Ford pickup truck that was ahead of him on the highway. The check identified a Soilio Diaz as the vehicle's registered owner and revealed that Diaz's license was suspended. Helzer

decided to stop the vehicle because the driver, consistent with its registered owner, was a middle-aged Hispanic male. As Helzer testified, "[t]he registered owner matched the description of the driver of the vehicle. And that was my probable cause." After stopping the vehicle, Helzer confirmed that Diaz was the driver and arrested him for driving with a suspended license in violation of Or. Rev. Stat. § 811.182.

Helzer also saw a passenger, Diaz-Castaneda, in the vehicle. Diaz-Castaneda, Diaz's brother, is a Mexican citizen who has previously been deported five times from the United States and who was convicted of first-degree manslaughter in 1987. Helzer said "licencia" (Spanish for "license") to Diaz-Castaneda, who handed over either an Oregon driver's license or Oregon ID card (Helzer could not remember which) accurately showing his true name. Helzer checked the identification document with radio dispatch and discovered an immigration detainer for Diaz-Castaneda's arrest as an illegal alien. Helzer testified that his reason for running the identification check on Diaz-Castaneda was "to discover if he had a valid license so he could take the vehicle so we didn't have to tow it." Helzer arrested Diaz-Castaneda on the detainer and took him to the Clackamas County jail, but did not fingerprint him or conduct any further investigation into the matter.

A few days later, U.S. Immigration and Customs Enforcement ("ICE") Agent Melinda Carrasco fingerprinted Diaz-Castaneda, placing one copy in his immigration "A" file and sending another copy to the FBI. Diaz-Castaneda's "A" file contained his photograph as well as multiple prior fingerprint cards. ICE Senior Special Agent Ruben Vela subsequently referred the case to the U.S. Attorney's Office for prosecution and forwarded the most recent fingerprint card to fingerprint expert Joel Mann. Mann confirmed that it matched earlier fingerprints of Diaz-Castaneda.

Diaz-Castaneda was indicted on a charge of illegal re-entry into the United States subsequent to an aggravated felony

conviction in violation of 8 U.S.C. § 1326(a), (b)(2). He moved to suppress evidence stemming from the August 2004 stop (including his identity and illegal alien status). The district court denied the motion, finding that there was no Fourth Amendment violation and that, even if there were, Diaz-Castaneda's identity and immigration status would inevitably have been discovered.

Diaz-Castaneda entered a conditional guilty plea to the charge in the indictment, retaining his right to raise on appeal the issues implicated in his motion to suppress. In January 2006, the district court sentenced him to 84 months imprisonment. Diaz-Castaneda timely appealed. We have jurisdiction under 28 U.S.C. §§ 1291, 1294.

## II.    Standard of Review

The district court's factual findings are reviewed for clear error. Its denial of Diaz-Castaneda's motion to suppress is reviewed de novo. *See United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006).

## III.    Discussion

Diaz-Castaneda argues that several aspects of the traffic stop — Helzer's initial license plate check, his decision to pull over the vehicle, his request for Diaz-Castaneda's identification and his check of Diaz-Castaneda's driver's license or Oregon ID card — violated the Fourth Amendment. We hold that none of these claims has merit. Because there was no Fourth Amendment violation we do not reach the question of whether suppression of Diaz-Castaneda's identity would be warranted if there were such a violation.

### A.    Standing

[1] Though neither party raises the issue, we note at the outset that Diaz-Castaneda has standing to pursue all of his

Fourth Amendment claims. Under *Rakas v. Illinois*, 439 U.S. 128, 134 (1978), he would lack standing to object to a *search of the vehicle*. But the Supreme Court has recently held, consistent with decisions in this and other circuits, that a passenger in a vehicle does have standing to claim that a *traffic stop* was unconstitutional. *See Brendlin v. California*, 127 S. Ct. 2400, 2403 (2007) ("We hold that a passenger is seized [when a traffic stop occurs] and so may challenge the constitutionality of the stop."); *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) ("As a passenger, Twilley has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car. . . . But Twilley challenged the initial stop, and a passenger may challenge a stop of a vehicle on Fourth Amendment grounds even if she has no possessory or ownership interest in the vehicle.") (internal citations and quotation marks omitted); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1163-64 (10th Cir. 1995) (same). Diaz-Castaneda thus has standing to object to the traffic stop and the license plate check that prompted it. He also, of course, has standing to argue that Helzer's request for his identification and Helzer's subsequent check of his driver's license or ID card were unconstitutional searches or seizures. These actions were directed at Diaz-Castaneda himself, rather than Diaz or Diaz's vehicle, and hence do not come under *Rakas*.

## B.   The License Plate Check

Diaz-Castaneda first contends that Helzer's check of Diaz's truck's license plate was an unreasonable search because Helzer had no articulable suspicion of any wrongdoing when he initiated the check. Diaz-Castaneda is correct that Helzer does not appear to have had any reason to run the check. Indeed, at the suppression hearing, Helzer explained why he thought he had probable cause to stop the vehicle *after* checking its license plate, but offered no explanation for why the check was conducted in the first place. Although running the check simply because Diaz and Diaz-Castaneda were His-

panic males would raise serious questions, Diaz-Castaneda's claim founders because we hold that a license plate check does not qualify as a search under the Fourth Amendment.

**[2]** No binding decision of this court has addressed whether license plate checks constitute Fourth Amendment searches. *Cf. Hallstein v. City of Hermosa Beach*, 87 Fed. App'x. 17, 19 (9th Cir. 2003) (unpublished) ("Nor does Hallstein have a reasonable expectation of privacy in information he voluntarily exposed to other people, such as his license plate. . . . [A]s Hallstein does not claim that the data stored in the DMV and police department databases were acquired by those institutions in violation of his Fourth Amendment rights, he cannot complain under the Fourth Amendment about access to that information by others."); *United States v. $277,000 U.S. Currency*, 941 F.2d 898, 901 (9th Cir. 1991) (holding that individual had no "legitimate expectancy of privacy" in backyard where cars were parked and thus "cannot contest the observation of the covered vehicles or the fact that they had Mexican license plates"). However, every circuit that has considered the issue in a precedential opinion has held that license plate checks do not count as searches under the Fourth Amendment. *See United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999); *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *cf. United States v. Sparks*, 37 Fed. Appx. 826, 829 (8th Cir. 2002) (unpublished); 1 Wayne R. Lafave, Search & Seizure § 2.5(b) (4th ed. 2004) ("[I]t is apparent that when a vehicle is [at a] location where it is readily subject to observation by members of the public, it is no search for the police to look at the exterior of the vehicle.").

**[3]** We agree that people do not have a subjective expectation of privacy in their license plates, and that even if they did, this expectation would not be one that society is prepared to recognize as reasonable. *Cf. Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (setting forth criteria for searches under Fourth Amendment). First, license plates

are located on a vehicle's exterior, in plain view of all passersby, and are specifically intended to convey information about a vehicle to law enforcement authorities, among others. No one can reasonably think that his expectation of privacy has been violated when a police officer sees what is readily visible and uses the license plate number to verify the status of the car and its registered owner. *See Ellison*, 462 F.3d at 561-62. Second, a license plate check is not intrusive. Unless the officer conducting the check discovers something that warrants stopping the vehicle, the driver does not even know that the check has taken place. *See Walraven*, 892 F.2d at 974. Third, the Supreme Court has ruled that people have no reasonable expectation of privacy in their vehicle identification number (VIN), which is located *inside* the vehicle but is typically visible from the outside. *See New York v. Class*, 475 U.S. 106, 113-14 (1986). If it was not a Fourth Amendment search when the police officers in *Class* opened a car's door and moved papers obscuring the VIN, it surely also was not a search when Helzer ran a computerized check of Diaz's license plate.

We are sympathetic to the concerns raised in dissent by Judge Moore in *Ellison*. Her dissent argued that while there may not be a legitimate privacy interest in "the particular combination of letters and numerals that make up [a] license-plate number," there is such an interest in the use of the license plate to "access information about the vehicle and its operator that may not otherwise be public or accessible by the police without heightened suspicion." 462 F.3d at 566-67 (Moore, J., dissenting). Furthermore, Judge Moore contended, license plate checks may easily be abused if there is no standard governing when police officers may conduct them; the "psychological invasion that results from knowing that one's personal information is subject to search by the police, for no reason, at any time one is driving a car is undoubtedly grave," *id.* at 568; and the "possibility and the reality of errors in the computer databases accessed by [the checks may] result in

unwarranted intrusions into privacy in the form of stops made purely on the basis of incorrect information," *id.* at 569.

We nevertheless side with the *Ellison* majority. First, any "psychological invasion" stemming from a license plate check does not seem particularly severe. To the contrary, silent computerized checks, conducted without any inconvenience to the vehicle's driver, are less intrusive than many actions the Supreme Court has held are not Fourth Amendment searches. *See, e.g.*, *Oliver v. United States*, 466 U.S. 170 (1984) (holding that entry into private property to observe marijuana plants in violation of "No Trespassing" sign was not a search); *Class*, 475 U.S. at 113-14 (same for physical opening of car door and moving of papers obscuring VIN); *Smith v. Maryland*, 442 U.S. 735 (1979) (same for use of pen register to record numbers dialed on phone line). Second, the possibilities of database error and police officer abuse, while real, do not create a legitimate expectation of privacy where none existed before. Government actions do not become Fourth Amendment searches simply because they *might* be carried out improperly. If an officer does go outside the proper bounds of a license plate search, it is *that* misconduct that might give rise to a constitutional or statutory violation.

**[4]** Finally, there is no indication that license plate checks in Oregon result in the retrieval of information that "may not otherwise be public or accessible by the police without heightened suspicion." The information that Helzer accessed about Diaz, namely that he was the registered owner of the truck and that his license was suspended, was already present in the police database and presumably available to any inquiring police officer. Were this not the case — for example, had Helzer used Diaz's license plate to obtain information that Diaz reasonably expected would be unavailable to the police, or had Helzer violated police guidelines regarding the proper searching of databases — our conclusion might very well be different. We hold today only that when police officers see a license plate in plain view, and then use that plate to access

additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search. *Cf. Ellison*, 462 F.3d at 562 ("The dissent fails to state how using a license plate number — in which there is no expectation of privacy — to retrieve other non-private information somehow creates a 'search' for the purposes of the Fourth Amendment.").

## C.   Other Fourth Amendment Claims

Three other aspects of the traffic stop that raised potential Fourth Amendment issues were Helzer's decision to pull over Diaz's truck, his request for Diaz-Castaneda's identification and his check of Diaz-Castaneda's driver's license or Oregon ID card. We hold that none of these actions was unconstitutional.

**[5]** First, Helzer's decision to stop the vehicle was plainly valid under *Wren v. United States*, 517 U.S. 806 (1996), in which the Supreme Court held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Even if the police officer making the stop has an illicit motivation for his action, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813. Here Helzer knew after conducting the license plate check that the registered owner of the truck was a male with a Hispanic surname and a suspended license, and then observed that the vehicle's actual driver was also a Hispanic male. He therefore had probable cause to believe that the traffic violation of driving with a suspended license was taking place, and the ensuing stop was constitutional regardless of Helzer's subjective intentions (which in any case we have no reason to doubt).

**[6]** Second, Helzer's request for Diaz-Castaneda's identification was also valid. The police may ask people who have legitimately been stopped for identification without conduct-

ing a Fourth Amendment search or seizure. *See Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). Here Helzer wanted to learn not only who the passenger was in a stopped vehicle, but also whether Diaz-Castaneda could drive the truck once Diaz was arrested. Helzer was therefore free to ask Diaz-Castaneda for identification without implicating the Fourth Amendment.

**[7]** Finally, Helzer's check of Diaz-Castaneda's driver's license or Oregon ID card with radio dispatch also was not a Fourth Amendment search or seizure. People do not have a reasonable expectation of privacy in their driver's license or state ID card (or the identification numbers contained by those documents) once they hand them over to police officers who legitimately asked for them. That is, there is no constitutional basis for complaint when the police properly obtain information located in a driver's license or state ID card, and then use it to access additional non-private (but inculpatory) information about the document's owner.[1] Diaz-Castaneda concedes that Helzer's check with radio dispatch was valid if it was a driver's license that he handed over. Nothing of Fourth Amendment import changes if it was actually an Oregon ID card he gave to Helzer, since both a license and an ID card are government-issued documents whose understood purpose is in part to enable a police officer to verify a person's identity (and access associated, non-private information).[2]

---

[1]We do not address here the different factual circumstance of a police officer *improperly* obtaining a person's driver's license or state ID card and then running a check of the document.

[2]Even if Helzer's request for Diaz-Castaneda's identification or subsequent check of Diaz-Castaneda's driver's license or Oregon ID card with radio dispatch implicated the Fourth Amendment, the actions were "rea-

## IV.   Conclusion

We hold that a license plate check does not constitute a Fourth Amendment search. We also hold that none of Helzer's actions after the license plate check — stopping Diaz's truck, requesting Diaz-Castaneda's identification and checking Diaz-Castaneda's driver's license or Oregon ID card with radio dispatch — violated the Fourth Amendment. Because there was no Fourth Amendment violation we do not reach the issue of whether Diaz-Castaneda's identity should be suppressed.

**AFFIRMED.**

---

sonably related in scope to the justification for their initiation." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (internal quotation marks omitted). The traffic stop itself was constitutional under *Whren*, and Helzer's subsequent actions were unintrusive and intended to determine whether Diaz-Castaneda could drive the vehicle once Diaz was arrested. Helzer also testified that "[i]t is customary that we run people if we have their identification," meaning that nothing out of the ordinary took place when he asked for and then checked Diaz-Castaneda's license or ID card. Thus even if Helzer's actions during the traffic stop *implicated* the Fourth Amendment, they did not *violate* it. *See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) ("[T]he law has become well established that during a routine traffic stop, an officer may request a driver's license and . . . run a computer check . . . ."); *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999) (same).