**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT M. NELSON; WILLIAM
BRUCE BRANERDT; JULIA BELL;
JOSETTE BELLAN; DENNIS V.
BYRNES; GEORGE CARLISLE; KENT
ROBERT CROSSIN; LARRY R.
D'ADDARIO; RILEY M. DUREN;
PETER R. EISENHARDT; SUSAN D.J.
FOSTER; MATTHEW P. GOLOMBEK;
VAROUJAN GORJIAN; ZAREH
GORJIAN; ROBERT J. HAW; JAMES
KULLECK; SHARLON L. LAUBACH;
CHRISTIAN A. LINDENSMITH;
AMANDA MAINZER; SCOTT
MAXWELL; TIMOTHY P. MCELRATH;
SUSAN PARADISE; KONSTANTIN
PENANEN; CELESTE M. SATTER;
PETER M. B. SHAMES; AMY SNYDER
HALE; WILLIAM JOHN WALKER;
PAUL R. WEISSMAN,
    *Plaintiffs-Appellants,*

     v.

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION, an Agency of the
United States; MICHAEL GRIFFIN,
Director of NASA, in his official
capacity only; UNITED STATES
DEPARTMENT OF COMMERCE;

No. 07-56424

D.C. No.
CV-07-05669-ODW

ORDER AND
OPINION

7137

CARLOS M. GUTIERREZ, Secretary
of Commerce, in his official
capacity only; CALIFORNIA
INSTITUTE OF TECHNOLOGY,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
December 5, 2007—Pasadena, California

Filed June 20, 2008

Before: David R. Thompson and Kim McLane Wardlaw,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Wardlaw

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

## COUNSEL

Dan Stormer and Virginia Keeny, Law Offices of Hadsell & Stormer, Inc., Pasadena, California, for the plaintiffs-appellants.

Mark B. Stern and Dana Martin, U.S. Department of Justice, Appellate Staff Civil Division, Washington, D.C., and Mark Holscher, R. Alexander Pilmer, and Mark T. Cramer, Kirkland & Ellis LLP, Los Angeles, California, for the defendants-appellees.

## ORDER

Our prior opinion filed on January 11, 2008, and reported at 512 F.3d 1134 is vacated concurrent with the filing of a new opinion today.

The petition for panel rehearing and the petition for rehearing en banc are denied as moot. The parties may file new petitions for rehearing and rehearing en banc in accordance with the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

## OPINION

WARDLAW, Circuit Judge:

The named appellants in this action ("Appellants") are scientists, engineers, and administrative support personnel at the Jet Propulsion Laboratory ("JPL"), a research laboratory run jointly by the National Aeronautics and Space Administration ("NASA") and the California Institute of Technology ("Caltech"). Appellants sued NASA, Caltech, and the Depart-

ment of Commerce (collectively "Appellees"), challenging NASA's recently adopted requirement that "low risk" contract employees like themselves submit to in-depth background investigations. The district court denied Appellants' request for a preliminary injunction, finding they were unlikely to succeed on the merits and unable to demonstrate irreparable harm. Because Appellants raise serious legal and constitutional questions and because the balance of hardships tips sharply in their favor, we reverse and remand.

## I

JPL is located on federally owned land, but operated entirely by Caltech pursuant to a contract with NASA. Like all JPL personnel, Appellants are employed by Caltech, not the government. Appellants are designated by the government as "low risk" contract employees. They do not work with classified material.

Appellants contest NASA's newly instated procedures requiring "low risk" JPL personnel to yield to broad background investigations as a condition of retaining access to JPL's facilities. NASA's new policy requires that every JPL employee undergo a National Agency Check with Inquiries (NACI), the same background investigation required of government civil service employees, before he or she can obtain an identification badge needed for access to JPL's facilities. The NACI investigation requires the applicant to complete and submit Standard Form 85 (SF 85), which asks for (1) background information, including residential, educational, employment, and military histories; (2) the names of three references that "know you well;" and (3) disclosure of any illegal drug use, possession, supply, or manufacture within the past year, along with the nature and circumstances of any such activities and any treatment or counseling received. This information is then checked against four government databases: (1) Security/Suitability Investigations Index; (2) the Defense Clearance and Investigation Index;

(3) the FBI Name Check; and (4) the FBI National Criminal History Fingerprint Check. Finally, SF 85 requires the applicant to sign an "Authorization for Release of Information" that authorizes the government to collect "any information relating to [his or her] activities from schools, residential management agents, employers, criminal justice agencies, retail business establishments, or other sources of information." The information sought "may include, but is not limited to, [the applicant's] academic, residential, achievement, performance, attendance, disciplinary, employment history, and criminal history record information."[1] The record is vague as to the exact extent to and manner in which the government will seek this information, but it is undisputed that each of the applicants' references, employers, and landlords will be sent an "Investigative Request for Personal Information" (Form 42), which asks whether the recipient has "any reason to question [the applicant's] honesty or trustworthiness" or has "any adverse information about [the applicant's] employment, residence, or activities" concerning "violations of law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," "general behavior or conduct," or "other matters." The recipient is asked to explain any adverse information noted on the form. Once the information has been collected, NASA and the federal Office of Personnel Management determine whether the employee is "suitable" for continued access to NASA's facilities, though the exact mechanics of this suitability determination are in dispute.[2]

---

[1]The form also notes that "for some information, a separate specific release will be needed," but does not explain what types of information will require a separate release.

[2]Appellants claim that the factors used in the suitability determination were set forth in a document, temporarily posted on JPL's internal website, labeled the "Issue Characterization Chart." The document identifies within categories designated "A" through "D" "[i]nfrequent, irregular, but deliberate delinquency in meeting financial obligations," "[p]attern of irresponsibility as reflected in . . . credit history," "carnal knowledge," "sodomy," "incest," "abusive language," "unlawful assembly," "attitude,"

Since it was first created in 1958, NASA, like all other federal agencies, has conducted NACI investigations of its civil servant employees but not of its contract employees. Around the year 2000, however, NASA "determined that the incomplete screening of contractor employees posed a security vulnerability for the agency" and began to consider requiring NACI investigations for contract employees as well. In November 2005, revisions to NASA's Security Program Procedural Requirements imposed the same baseline NACI investigation for all employees, civil servant or contractor. These changes were not made applicable to JPL employees until January 29, 2007, when NASA modified its contract with Caltech to include the requirement. Caltech vigorously opposed the change, but NASA invoked its contractual right to unilaterally modify the contract and directed Caltech to comply immediately with the modifications. Caltech subsequently adopted a policy—not required by NASA—that all JPL employees who did not successfully complete the NACI process so as to receive a federal identification badge would be deemed to have voluntarily resigned their Caltech employment.

On August 30, 2007, Appellants filed suit alleging, both individually and on behalf of the class of JPL employees in non-sensitive or "low risk" positions, that NASA's newly imposed background investigations are unlawful. Appellants bring three primary claims: (1) NASA and the Department of Commerce (collectively "Federal Appellees") violated the Administrative Procedure Act ("APA") by acting without

"homosexuality . . . when indications are present of possible susceptibility to coercion or blackmail," "physical health issues," "mental, emotional, psychological, or psychiatric issues," "issues . . . that relate to an associate of the person under investigation," and "issues . . . that relate to a relative of the person under investigation." NASA neither concedes nor denies that these factors are considered as part of its suitability analysis; instead, it suggests that Appellants have not sufficiently proved that such factors will play a role in any individual case.

statutory authority in imposing the investigations on contract employees; (2) the investigations constitute unreasonable searches prohibited by the Fourth Amendment; and (3) the investigations violate their constitutional right to informational privacy.

On September 24, 2007, Appellants moved for a preliminary injunction against the new policy on the basis that any JPL worker who failed to submit an SF 85 questionnaire by October 5, 2007, would be summarily terminated. The district court denied Appellants' request. It divided Appellants' claims into two categories—those challenging the SF 85 questionnaire itself and those challenging the grounds upon which an employee might be deemed unsuitable—and found that the challenges to the suitability determination were highly speculative and unripe for judicial review. The court rejected Appellants' APA claim, finding statutory support for the investigations in the National Aeronautics and Space Act of 1958 (the "Space Act"), 42 U.S.C. § 2455(a). The court rejected Appellants' Fourth Amendment argument, holding that a background investigation was not a "search" within the meaning of the Fourth Amendment. Finally, the court found that the SF 85 questionnaire implicated the constitutional right to informational privacy but was narrowly tailored to further the government's legitimate security interest. After concluding that Appellants had little chance of success on the merits, the district court also found that they could not demonstrate irreparable injury because any unlawful denial of access to JPL's facilities could be remedied post hoc through compensatory relief.

On appeal, a motions panel of our court granted a temporary injunction pending a merits determination of the denial of the preliminary injunction. *Nelson v. NASA*, 506 F.3d 713 (9th Cir. 2007). The panel concluded that the information sought by SF 85 and its waiver requirement raised serious privacy issues and questioned whether it was narrowly tailored to meet the government's legitimate interest in ascertaining

the identity of its low-risk employees. *Id.* at 716. The panel further found that "[t]he balance of hardships tips sharply in favor of [A]ppellants," who risk losing their jobs pending appeal, whereas there was no exigent reason for performing the NACI investigations during the few months pending appeal given that "it has been more than three years since the Presidential Directive [upon which the government relies] was issued." *Id.* at 716.

## II

To obtain preliminary injunctive relief, Appellants must demonstrate either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). The two prongs are not separate tests but rather "extremes of a single continuum," so "the greater the relative hardship to [the party seeking the preliminary injunction], the less probability of success must be shown." *Id.* (internal quotation marks omitted).

Upon review of the merits of the district court's denial of preliminary injunctive relief, we find ourselves in agreement with the motions panel. Appellants have demonstrated serious questions as to their informational privacy claim, and the balance of hardships tips sharply in their favor. We therefore conclude that the district court abused its discretion in denying Appellants' motion for a preliminary injunction, and we reverse and remand.

## A. *Standing and Ripeness*

The district court found that the justiciability doctrines of ripeness and standing precluded consideration of Appellants' claims, except as they concerned the SF 85 questionnaire and associated waiver. We agree with the district court that Appellants' claims concerning the suitability determination are

unripe and unfit for judicial review; however, the district court misconstrued Appellants' informational privacy claim, viewing it as limited to the SF 85 questionnaire alone.

[1] To enforce Article III's limitation of federal jurisdiction to "cases and controversies," plaintiffs must demonstrate both standing and ripeness. To demonstrate standing, a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). The ripeness doctrine similarly serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and requires assessing " 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

[2] In analyzing justiciability, the district court distilled Appellants' claims into two basic arguments: (1) "that SF 85 is overly broad and intrusive considering the 'low-risk' nature of [appellants'] jobs at JPL" and (2) "that JPL's internal policy, which lists various grounds upon which an employee can be determined unsuitable for employment, is unconstitutional." We agree that challenges to the suitability determination are unripe because the record does not sufficiently establish how the government intends to determine "suitability"— accordingly, any claims are "strictly speculative." We also agree that Appellants have standing to challenge the SF 85 questionnaire, and because "it is undisputed that if [Appellants] do not sign the SF 85 waiver by October 5, 2007," they will "be deemed to have voluntarily resigned," there exists a "concrete injury that is imminent and not hypothetical" and thus ripe for review.

**[3]** However, the district court overlooked Appellants' challenges to the government *investigation* that will result from the SF 85 requirement that the applicant sign an "authorization for release of information." On its face, this waiver authorizes the government to collect "*any* information . . . from schools, residential management agents, employers, criminal justice agencies, retail business establishments, or other sources of information" "includ[ing], but . . . not limited to, . . . academic, residential, performance, attendance, disciplinary, employment history, and criminal history record information." (emphasis added). It is uncontested that as a result of this authorization, the government Office of Personnel Management will send out "Investigative Request[s] for Personal Information," Form 42, to references, employers, and landlords. This form seeks highly personal information using an open-ended questioning technique, including asking for "any adverse information" at all or any "additional information which . . . may have a bearing on this person's suitability for government employment." Any harm that results from Form 42's dissemination and the information consequently provided to the government will be concrete and immediate.

**[4]** Because Federal Appellees freely admit that Form 42 will be used in NASA's background investigations, Appellants have standing to challenge Form 42's distribution and solicitation of private information, and the issues raised in these challenges are ripe for review. The district court erred by excluding Form 42 claims from its analysis of Appellants' likelihood of success on the merits.

## B. *APA Claim*

**[5]** Appellants first claim that Federal Appellees violated the APA by imposing background investigations on contract employees without any basis in executive order or statute. The district court found that Congress gave NASA the authority to

conduct such investigations in the Space Act of 1958, which provides:

> The [NASA] Administrator shall establish such security requirements, restrictions, and safeguards as he deems necessary in the interest of the national security. The Administrator may arrange with the Director of the Office of Personnel Management for the conduct of such security or other personnel investigations of the Administration's officers, employees, and consultants, and its contractors and subcontractors and their officers and employees, actual or prospective, as he deems appropriate . . . .

42 U.S.C. § 2455(a).

Appellants argue that the "security or other personnel investigations" described in the second sentence of § 2455(a) are examples of the "security requirements, restrictions, and safeguards" described in the first sentence and therefore may only be established "as . . . deem[ed] necessary in the interest of the national security." They then argue that this limiting clause must be read in light of *Cole v. Young*, 351 U.S. 536 (1956), where the Supreme Court interpreted a statute giving certain government officials the power to summarily dismiss employees "when deemed necessary in the interest of the national security." *Id.* at 538 (internal quotation marks omitted). In *Cole*, the Court found it clear "that 'national security' was not used in the Act in an all-inclusive sense, but was intended to refer only to the protection of 'sensitive' activities" and therefore held that "an employee can be dismissed 'in the interest of the national security' under the Act only if he occupies a 'sensitive' position." *Id.* at 551. Appellants claim that, by using identical limiting language in the Space Act so soon after *Cole*, Congress intended to authorize personnel investigations only of contractors in "sensitive" positions and not of the "low risk" contractors at issue in this case.

**[6]** We need not resolve whether the reference to the "interest of the national security" in § 2455(a) should be interpreted in light of *Cole*, because we read this limiting language to apply only to the "security requirements, restrictions, and safeguards" described in the first sentence and not to the "personnel investigations" described in the second sentence. The second sentence could plausibly be read as an example of the "security requirements, restrictions, and safeguards" described in the first sentence, but the statute's legislative history strongly suggests that it was instead meant to be a separate and distinct authorization of power. The Conference Report describes the two sentences separately and notes that the Senate version of the bill contained the second sentence but not the first. Conf. Rep. No. 2166 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3160, 3190, 3197-98. This suggests that § 2455(a) provides two distinct authorizations, the latter of which allows the NASA Administrator to arrange for "security and other personnel investigations" of contractors "as he deems appropriate," regardless of whether these investigations are "necessary in the interest of the national security." Because the Space Act appears to grant NASA the statutory authority to require the investigations here at issue, we agree with the district court that Appellants are unlikely to succeed on the merits of their APA claim.³

---

³To the extent that NASA has authority to require drug tests for current contractors, that authority is spelled out in the Civil Space Employee Testing Act, codified at 42 U.S.C. § 2473c. Congress enacted the Testing Act as part of the National Aeronautics & Space Administration Authorization Act, Fiscal Year 1992, and not as part of the Space Act of 1958. With the Testing Act, Congress gave NASA the power to administer a drug testing program for those employees or contractors responsible for "safety-sensitive, security, or national security functions." *Id.* § 2473c(c)(1)-(2). The "program shall provide for preemployment, reasonable suspicion, random, and post-accident testing for use . . . of alcohol or a controlled substance." *Id.* Moreover, the statute provides that any drug test "shall . . . provide for the confidentiality of test results and medical information of employees." *Id.* § 2473c(f)(7).

## C.  *Fourth Amendment Claim*

We also agree with the district court's conclusion that Appellants are unlikely to succeed on their Fourth Amendment claims, because the government's actions are not likely to be deemed "searches" within the meaning of the Amendment. An action to uncover information is generally considered a "search" if the target of the search has a "reasonable expectation of privacy" in the information being sought, a term of art meaning a "subjective expectation of privacy . . . that society is prepared to recognize as reasonable." *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1151 (9th Cir. 2007) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). One does not have a "reasonable expectation of privacy" in one's information for Fourth Amendment purposes merely because that information is of a "private" nature; instead, Fourth Amendment protection can evaporate in any of several ways. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 443 (1976) (holding that there is no reasonable expectation of privacy in bank records in part because the information was voluntarily disclosed to the bank). To succeed on their Fourth Amendment claim, therefore, Appellants must demonstrate that either the Form 42 inquiries sent to third parties or the SF 85 questionnaire itself violates a "reasonable expectation of privacy" so as to be considered a "search" within the meaning of the Amendment.

### 1.  Form 42 Inquiries

**[7]** "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351 (1967); however, information does not lose Fourth Amendment protection simply because it is conveyed to another party. For example, in *Katz*, FBI agents attached an electronic listening device to the outside of a public telephone booth and recorded the defendant transmitting illegal betting information over the telephone. *Id.* at 348. Even though the booth's occupant had voluntarily con-

veyed the information in the conversation to the party on the other end of the line, the Court found that he was "surely entitled to assume that the words he utters into the mouthpiece w[ould] not be broadcast to the world," so the covert surveillance was considered a search within the meaning of the Amendment. *Id.* at 352-53.

On the other hand, in *United States v. White*, the Supreme Court held that the electronic surveillance of a conversation between a defendant and a government informant did *not* constitute a "search" for Fourth Amendment purposes. 401 U.S. 745, 754 (1971) (plurality). The Court acknowledged that, as in *Katz*, the speaker likely expected the content of the conversations to be kept private; however, it held as a bright-line rule that the Fourth Amendment "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' " *Id.* at 749 (quoting *Hoffa v. United States*, 385 U.S. 293, 302 (1966)). In *United States v. Miller*, 425 U.S. 435 (1976), holding that the government could subpoena private bank records without implicating the Fourth Amendment, the Court extended the bright-line rule to all information knowingly revealed to the government by third parties:

> [T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Id.* at 443.

**[8]** In the challenged background investigations, the government will send written Form 42 inquiries to the applicant's acquaintances. Through these inquiries, the third parties may disclose highly personal information about the applicant. As in *White* and *Miller*, the applicant presumably revealed this

information to the third party with the understandable expectation that this information would be kept confidential. Nonetheless, these written inquiries appear to fit squarely under *Miller*'s bright-line rule and therefore cannot be considered "searches" under the Fourth Amendment.[4]

## 2.  SF 85 Questionnaire

**[9]** The SF 85 questionnaire required of the applicant is also unlikely to be considered a Fourth Amendment "search." Requiring an individual to answer questions may lead to the forced disclosure of information that he or she reasonably expects to keep private. Historically, however, when "the objective is to obtain testimonial rather than physical evidence, the relevant constitutional amendment is not the Fourth but the Fifth." *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587, 591 (7th Cir. 2005) (holding that a psychological examination required for continued government employment was not a search under the Fourth Amendment).

As Judge Posner notes in *Greenawalt*, direct questioning can potentially lead to a far greater invasion of privacy than many of the physical examinations that have in the past been considered Fourth Amendment "searches." *Id.* at 589-90. Nonetheless, applying the Fourth Amendment to such questioning would force the courts to analyze a wide range of novel contexts (e.g., courtroom testimony, police witness interviews, credit checks, and, as here, background checks) under a complex doctrine, with its cumbersome warrant and probable cause requirements and their myriad exceptions, that was designed with completely different circumstances in

---

[4]This analysis presupposes that the applicant voluntarily revealed the information to the third party. For example, the Fourth Amendment could still apply if the government actively used third parties to uncover private information. *See United States. v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981) (noting that the Fourth Amendment is implicated when "a private party acts as an 'instrument or agent' of the state in effecting a search or seizure.").

mind. *Id.* at 590-91. Moreover, declining to extend the Fourth Amendment to direct questioning will by no means leave individuals unprotected, as such contexts will remain governed by traditional Fifth and Sixth Amendment interrogation rights, and the right to informational privacy described below. *See id.* at 591-92.

**[10]** Because neither the written inquiries directed at third parties nor the SF 85 questionnaire directed at the applicants will likely be deemed "searches," Appellants are unlikely to succeed on their Fourth Amendment claims.

## D. *Informational Privacy Claim*

Although the district court correctly found that Appellants were unlikely to succeed on their APA and Fourth Amendment claims, it significantly underestimated the likelihood that Appellants would succeed on their informational privacy claim. These constitutional errors stem in large part from the court's erroneous ripeness ruling; by limiting its analysis to the SF 85 questionnaire, the court failed to consider the most problematic aspect of the government's investigation—the open-ended Form 42 inquiries.

**[11]** We have repeatedly acknowledged that the Constitution protects an "individual interest in avoiding disclosure of personal matters." *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). This interest covers a wide range of personal matters, including sexual activity, *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983) (holding that questioning police applicant about her prior sexual activity violated her right to informational privacy), medical information, *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."), and financial matters, *Crawford*, 194 F.3d at 958 (agreeing that public disclosure of social security numbers may implicate the

right to informational privacy in "an era of rampant identity theft"). If the government's actions compel disclosure of private information, it "has the burden of showing that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959 (internal quotation marks omitted). We must "balance the government's interest in having or using the information against the individual's interest in denying access," *Doe v. Att'y Gen.*, 941 F.2d 780, 796 (9th Cir. 1991), weighing, among other things:

> "the type of [information] requested, . . . the potential for harm in any subsequent nonconsensual disclosure, . . . the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating towards access."

*Id.* (quoting *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980)) (alteration in original).

Both the SF 85 questionnaire and the Form 42 written inquiries require the disclosure of personal information and each presents a ripe controversy. Therefore, whereas the district court limited its analysis to the SF 85 questionnaire, we consider the constitutionality of both aspects of the investigation in turn.

### 1.  SF 85 Questionnaire

**[12]** Appellants concede that most of the questions on the SF 85 form are unproblematic and do not implicate the constitutional right to informational privacy. They do however challenge the constitutionality of one group of questions concerning illegal drugs. The questionnaire asks the applicant:

> In the last year, have you used, possessed, supplied, or manufactured illegal drugs? . . . . If you answered

"Yes," provide information relating to the types of substance(s), the nature of the activity, and any other details relating to your involvement with illegal drugs. Include any treatment or counseling received.

The form indicates that "[n]either your truthful response nor information derived from your response will be used as evidence against you in any subsequent criminal proceeding." The district court concluded that the requested information implicated the right to informational privacy, but found that there were "adequate safeguards in place [to deal with these] sensitive questions."

Other courts have been skeptical that questions concerning illegal drug use—much less possession, supply, or manufacture—would even implicate the right to informational privacy. For example, in *Mangels v. Pena*, 789 F.2d 836 (10th Cir. 1986), the Tenth Circuit held that the disclosure of fire-fighters' past illegal drug use did not violate their informational privacy rights. *Id.* at 839-40. The Court held that "[t]he possession of contraband drugs does not implicate any aspect of personal identity which, under prevailing precedent, is entitled to constitutional protection. . . . Validly enacted drug laws put citizens on notice that this realm is not a private one." *Id.* at 839 (internal citations omitted). In *National Treasury Employees' Union v. U.S. Department of Treasury*, 25 F.3d 237 (5th Cir. 1994), the Fifth Circuit considered a similar form to the SF 85 questionnaire, with almost identical questions concerning illegal drugs, and rejected the applicants' informational privacy claims. The Court raised similar concerns to the Tenth Circuit:

Today's society has made the bold and unequivocal statement that illegal substance abuse will not be tolerated. The government declared an all-out war on illegal drugs more than a decade ago. . . . Surely anyone who works for the government has a diminished expectation that his drug and alcohol abuse history

can be kept secret, given that he works for the very government that has declared war on substance abuse.

*Id.* at 243. The Court also noted that the plaintiffs in that case were all federal employees in either "High" or "Moderate" risk "public trust" positions, and were thus acutely "aware of [their] employer's elevated expectations in [their] integrity and performance." *Id.* at 244.

Like the Tenth and Fifth Circuits, we are sensitive to the government's interest in uncovering and addressing illegal substance abuse among its employees and contractors, given the public stance it has taken against such abuse. This government interest is undoubtedly relevant to the constitutional balancing inquiry: whether the forced disclosure "would advance a legitimate state interest and [is] narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959. We are less convinced, however, that the government's interest should inform the threshold question of whether requested information is sufficiently personal to invoke the constitutional right to privacy. We doubt that the government can strip personal information of constitutional protection simply by criminalizing the underlying conduct—instead, to force disclosure of personal information, the government must at least demonstrate that the disclosure furthers a legitimate state interest. Drug dependance and abuse carries an enormous stigma in our society and "is not generally disclosed by individuals to the public." *Id.* at 958. If we had to reach the issue, therefore, we would be inclined to agree with the district court that SF 85's drug questions reach sensitive issues that implicate the constitutional right to informational privacy.

**[13]** We do not need to decide this issue, however, because even if the question requiring disclosure of prior drug use, possession, supply, and manufacture does implicate the privacy right, it is narrowly tailored to achieve the government's legitimate interest. As our sister circuits have lucidly

explained, the federal government has taken a strong stance in its war on illegal drugs, and this stance would be significantly undermined if its own employees and contractors freely ignored its laws. By requiring applicants to disclose whether they have "used, possessed, supplied, or manufactured illegal drugs" within the past year, and, if so, to explain the "nature of the activity" and "any other details relating to [the applicant's] involvement with illegal drugs," the government has crafted a narrow inquiry designed to limit the disclosure of personal information to that which is necessary to further the government's legitimate interest.

[14] The same cannot be said, however, for requiring applicants to disclose "any treatment or counseling received" for their drug problems. Information relating to medical treatment and psychological counseling fall squarely within the domain protected by the constitutional right to informational privacy. *See Norman-Bloodsaw*, 135 F.3d at 1269; *Doe*, 941 F.2d at 796. The government has not suggested any legitimate interest in requiring the disclosure of such information; indeed, any treatment or counseling received for illegal drug use would presumably *lessen* the government's concerns regarding the underlying activity. Because SF 85 appears to *compel* disclosure of personal medical information for which the government has failed to demonstrate a legitimate state interest, Appellants are likely to succeed on this—albeit narrow—portion of their informational privacy challenge to SF 85.

## 2. Form 42 Inquiries

[15] The Form 42 written inquiries—omitted from the district court's analysis as a result of its erroneous ripeness holding—are much more problematic. Form 42 solicits "any adverse information" concerning "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," "general behavior or conduct," and "other matters." These open-ended questions are designed to elicit a wide range of adverse, private information that "is not generally disclosed

by individuals to the public" and therefore seemingly implicate the right to informational privacy. *Crawford*, 194 F.3d at 958.[5]

The government suggests that even if the information disclosed in the investigation implicates the right to informational privacy, the scheme must be upheld because the government has taken measures to keep the information from being disclosed to the general public. Although the risk of public disclosure is undoubtedly an important consideration in our analysis, *see Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 790 (9th Cir. 2002), it is only one of many factors that we should consider, *id.* at 789-90 ("[T]he right to

[5]The constitutional right to informational privacy is concerned with "the individual interest in avoiding disclosure of personal matters." In determining whether the right applies, our cases have emphasized the *nature* of the information sought—in particular, whether it is sufficiently "personal" to merit protection, *see Crawford*, 194 F.3d at 958; *Doe*, 941 F.2d at 796 —rather than on the manner in which the information is sought. The highly personal information that the government seeks to uncover through the Form 42 inquiries is protected by the right to privacy, whether it is obtained from third parties or from the applicant directly.

In this respect, the right to informational privacy differs from the Fourth Amendment, which, as a bright-line rule, "does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities." *Miller*, 425 U.S. at 443. This principle has occasionally been rephrased as a general holding "that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). We think it is clear, however, that the "legitimate expectation of privacy" described in this context is a term of art used only to define a "search" under the Fourth Amendment, and *Miller* and *Smith* do not preclude an *informational privacy* challenge to government questioning of third parties about highly personal matters. If the constitutional right to informational privacy were limited to cases that involved a Fourth Amendment "search," the two rights would be entirely redundant. Indeed, although the two doctrines often overlap, *see Norman-Bloodsaw*, 135 F.3d at 1269, we have repeatedly found the right to informational privacy implicated in contexts that did not involve a Fourth Amendment "search," *see, e.g.*, *Thorne*, 726 F.2d at 468.

'informational privacy' . . . applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public."); *Norman-Bloodsaw*, 135 F.3d at 1269 (noting that a government action can violate the right to privacy without disclosure to third parties); *Doe*, 941 F.2d at 796 (listing, as two factors among many, " 'the potential for harm in any subsequent nonconsensual disclosure [and] the adequacy of safeguards to prevent authorized disclosure.' " (quoting *Westinghouse Elec. Corp.*, 638 F.2d at 578). Therefore, although safeguards exist to help prevent disclosure of the applicants' highly sensitive information, Federal Appellees must still demonstrate that the background investigations are justified by legitimate state interests and that Form 42's questions are "narrowly tailored to meet those legitimate interests." *Thorne*, 726 F.2d at 469.

We agree with the government that it has several legitimate reasons for investigating its contractors. NASA has an interest in verifying its contractors' identities to make sure that they are who they say they are, and it has an interest in ensuring the security of the JPL facility so as not to jeopardize the costly investments housed therein. Appellants concede, as they must, that these are legitimate government interests.

The government has failed to demonstrate, however, that Form 42's questions are "narrowly tailored" to meet these legitimate interests. Initially, we note that although NASA has a general interest in keeping the JPL facility secure, there is no specific evidence in the record to suggest that any of the "low risk" JPL personnel pose such a security risk; indeed, NASA appears to designate as "moderate risk" any individual who has the "opportunity to cause damage to a significant NASA asset or influence the design or implementation [of] a security mechanism designed to protect a significant NASA asset." More importantly, Form 42's broad, open-ended questions appear to range far beyond the scope of the legitimate state interests that the government has proposed. Asking for

"*any* adverse information about this person's employment, residence, or activities" may solicit some information relevant to the applicant's identity or security risk, but there are no safeguards in place to limit the disclosures to information relevant to these interests. Instead, the form invites the recipient to reveal *any* negative information of which he or she is aware. It is difficult to see how the vague solicitation of derogatory information concerning the applicant's "general behavior or conduct" and "other matters" could be narrowly tailored to meet *any* legitimate need, much less the specific interests that Federal Appellees have offered to justify the new requirement.

**[16]** Finally, the context in which the written inquiries are posed further supports Appellants' claim. In *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983), we focused not only on the private nature of questions asked, but also on the lack of standards governing the inquiry. We held that questioning a female police applicant about her past sexual relations with another officer in the department violated her constitutional right to informational privacy, *id.* at 468, finding that many of the questions posed went beyond any relevant lines of questioning, *id.* at 469-70. More importantly, we noted that the city had not set any *standards* for inquiring about the private information. *Id.* at 470. "When the state's questions directly intrude on the core of a person's constitutionally protected privacy and associational interests . . . , an unbounded, standardless inquiry, even if founded upon a legitimate state interest, cannot withstand the heightened scrutiny with which we must view the state's action." *Id.* In this case, the government's questions stem from SF 85's extremely broad authorization, allowing it "to obtain *any* information" from any source, subject to other releases being necessary only in some vague and unspecified contexts. Federal Appellees have steadfastly refused to provide any standards narrowly tailoring the investigations to the legitimate interests they offer as justification. Given that Form 42's open-ended and highly private questions are authorized by

this broad, standardless waiver and do not appear narrowly tailored to any legitimate government interest, the district court erred in finding that Appellants were unlikely to succeed on their informational privacy claim.

## E. *Balance of Hardships*

[17] The balance of hardships tips sharply toward Appellants, who face a stark choice—either violation of their constitutional rights or loss of their jobs. The district court erroneously concluded that Appellants will not suffer any irreparable harm because they could be retroactively compensated for any temporary denial of employment. It is true that "monetary injury is not normally considered irreparable," *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980), and the JPL employees who choose to give up their jobs may later be made whole financially if the policy is struck down. However, in the meantime, there is a substantial risk that a number of employees will not be able to finance such a principled position and so will be coerced into submitting to the allegedly unconstitutional NACI investigation. Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Morever, the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages.

[18] On the other side of the balance, NASA has not demonstrated any specific harm that it will face if it is enjoined for the pendency of the adjudication from applying its broad investigatory scheme to "low risk" JPL contract employees, many of whom have worked at the laboratory for decades. As Caltech argues, JPL has successfully functioned without any background investigations since the first contract between NASA and JPL in 1958, so granting injunctive relief would make NASA no worse off than it has ever been. Moreover, an

injunction in this case would not affect NASA's ability to investigate JPL personnel in "high risk" or "moderate risk" positions, significantly undercutting any lingering security fears. Finally, we note that NASA has taken years to implement NACI at JPL, a fact we construe as weakening any urgency in imposing the investigations before Appellants' claims are fully adjudicated on their merits.

## III

Caltech separately argues that any injunctive relief should not encompass it because, as a private actor, it cannot be held liable for constitutional violations that arise from the government-imposed background investigations. Caltech is correct that there exists a "presumption that private conduct does not constitute government action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). This presumption is rebutted, however, when a sufficient nexus "make[s] it fair to attribute liability to the private entity as a governmental actor. Typically, the nexus consists of some *willful participation in a joint activity* by the private entity and the government." *Id.* at 843 (emphasis added).

[19] Caltech notes that it initially opposed the new background investigations, which are conducted entirely by NASA and other government agencies; therefore, it claims that the investigations are not "joint activities" and Caltech is not a "willful participant." We have some sympathy for this argument, and if Caltech had done nothing more than abide by the contract terms unilaterally imposed by NASA, we might agree with its position. Here, however, the record is clear that Caltech did do more—it established, on its own initiative, a policy that JPL employees who failed to obtain federal identification badges would not simply be denied access to JPL, they would be terminated entirely from Caltech's employment. This decision does not necessarily render Caltech liable as a governmental actor, but it raises serious questions as to whether the university has in fact now become a willful and

joint participant in NASA's investigation program, even though it was not so initially. Caltech's threat to terminate non-compliant employees is central to the harm Appellants face and creates the coercive environment in which they must choose between their jobs or their constitutional rights. Moreover, with the government enjoined, Caltech faces no independent harm to itself, so the balance of hardships tips overwhelmingly in Appellants' favor. Therefore, we hold that preliminary injunctive relief should apply both to Caltech and to Federal Appellees.

## IV

Appellants have raised serious questions as to the merits of their informational privacy claim and the balance of hardships tips sharply in their favor. The district court's denial of the preliminary injunction was based on errors of law and hence was an abuse of discretion. Accordingly, we reverse and remand with instructions to fashion preliminary injunctive relief consistent with this opinion.

**REVERSED and REMANDED.**