**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT M. NELSON; et al.,
        *Plaintiffs-Appellants,*

v.

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION, an Agency of the
United States; et al.,
        *Defendants-Appellees.*

No. 07-56424

D.C. No.
CV-07-05669-ODW
Central District of
California,
Los Angeles

ORDER

Filed June 4, 2009

Before: David R. Thompson and Kim McLane Wardlaw,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Order;
Concurrence by Judge Wardlaw;
Dissent by Judge Callahan;
Dissent by Judge Kleinfeld;
Dissent by Chief Judge Kozinski

## ORDER

Judges Thompson, Wardlaw, and Reed voted to deny
Appellees' petition for panel rehearing. Judge Wardlaw voted
to deny Appellees' petition for rehearing en banc, and Judges
Thompson and Reed so recommended.

The full court was advised of the petition for rehearing en
banc. A judge requested a vote on whether to rehear the mat-

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

6963

ter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. Fed. R. App. P. 35. Judges O'Scannlain and Ikuta were recused.

The petition for rehearing en banc is denied.

IT IS SO ORDERED.

---

WARDLAW, Circuit Judge, concurring in the denial of rehearing en banc, joined by PREGERSON, REINHARDT, W. FLETCHER, FISHER, PAEZ, and BERZON Circuit Judges:

Because the preliminary posture and the lack of an evidentiary record prevent us from fully reviewing the merits of this appeal, because the panel opinion creates no intra- or inter-circuit split, and because the narrow holding does not present an issue of exceptional importance, the active judges of our court, in a vote that was not close,[1] denied rehearing of this case en banc. I concur.

This is an interlocutory appeal from the denial of a preliminary injunction sought by a class[2] of long-term California

---

[1] *Compare Cooper v. Brown*, No. 05-99004, 2009 WL 1272436, at *57 (9th Cir. May 11, 2009) (Reinhardt, J., dissenting from denial of rehearing en banc).

[2] The putative class consists of up to 9,000 employees—not merely the 28 class representatives referenced in Judge Callahan's dissent. Class representatives include preeminent research scientists who have coordinated the Mars Exploration Rover Mission, served on the Jet Propulsion Laboratory ("JPL") Senior Research Counsel, and led NASA's New Millennium Program and the Mars Pathfinder Mission. Class representatives also include leading engineers who have been at the forefront of many recent space missions, including the Mars Exploration Rovers Project, and the Galileo, Messenger (Mercury), and Magellan (Venus) missions, as well as

Institute of Technology ("Caltech") employees, including scientists, engineers, and administrative support personnel—all classified by the National Aeronautics and Space Administration ("NASA") as low risk employees.[3] They oppose implementation of a new, wide-ranging, and highly intrusive background check imposed as a condition of their continued employment at Jet Propulsion Laboratory ("JPL"). Caltech itself objected to the new requirement as "inappropriate." Reversing the district court's denial of the preliminary injunction, we concluded that, as to the constitutional right of privacy claim,[4] "serious questions going to the merits were raised and the balance of harms tips sharply in [the plaintiff-class's] favor," *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999),[5] where the class faced the Hobson's

JPL's chief engineer for flight dynamics, the project system engineer for the Kepler Space Observatory, and a lead principal engineer on the Constellation Program. Their research and findings have been published widely in scientific, peer-reviewed journals, and they have received hundreds of prestigious awards from NASA and the research community. The success of their scientific mission, which has been operating since 1958 without the new background checks, is renowned.

[3]Low risk employment positions do not involve policymaking, major program responsibility, public safety, duties demanding a significant degree of public trust, or access to financial records with significant risk of causing damage or realizing personal gain. See 5 C.F.R. § 731.106(b) (defining the characteristics of positions at the high or moderate risk levels). NASA itself designated members of the plaintiff class as low risk; low risk employees comprise ninety-seven percent of JPL employees. NASA's designation of every position subject to a suitability determination "as a high, moderate, or low risk level as determined by the position's potential for adverse impact to the efficiency or integrity of the service" is authorized by the U.S. Office of Personnel Management. *See* 5 C.F.R. § 731.106(a).

[4]We affirmed the district court's rejection of the class's Administrative Procedure Act and Fourth Amendment claims.

[5]Because our decision issued in December 2007, we did not have the benefit of the Supreme Court's most recent formulation of the preliminary injunction standard in *Winter v. Natural Resources Defense Council, Inc.*,

choice of losing their jobs or submitting to an unprecedented intrusion into their private lives for which the government failed to advance a legitimate state interest. *Nelson v. NASA* (*Nelson II*), 530 F.3d 865, 883 (9th Cir. 2008). "[S]ubsumed in our analysis of the balance of hardship to the parties," *Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008), was our determination that this "injunction is in the public interest," *Winter v. Natural Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 374 (2008), since it is indisputable that entry of the injunction "further[s] the public's interest in aiding the struggling local economy and preventing job loss," *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc).[6] *See Nelson II*, 530 F.3d

___ U.S. ___, 129 S. Ct. 365, 374 (2008) (holding that a party requesting preliminary injunctive relief must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest"). Our result would be no different under *Winter*, however, because we did not apply the "possibility of irreparable injury" standard that the *Winter* Court found "too lenient." *Id.* at 375. Instead, we concluded that the employees "face[d] a stark choice— either violation of their constitutional rights or loss of their jobs." *Nelson II*, 530 F.3d at 881. "[C]onstitutional violations . . . generally constitute irreparable harm" and "the loss of one's job . . . carries emotional damages and stress, which cannot be compensated by mere back payment of wages." *Id.* at 882. Irreparable harm, therefore, was not only likely, but certain.

[6]Thus, the public interest requires consideration of the fact that the California unemployment rate reached 10.1 percent in January 2009 due to the loss of 79,300 jobs, the largest unemployment increase in any state for the month, *see Regional and State Employment and Unemployment Summary*, U.S. Bureau of Labor Statistics 1, 3 (Mar. 11, 2009). Clearly, the public interest in minimizing job loss in this difficult economic climate, *The Lands Council*, 537 F.3d at 1005, weighs in favor of the injunction pending a merits determination. The loss of up to 9,000 jobs from one of Pasadena's largest employers would be particularly devastating in this community, which has an estimated labor force of 77,200 people. *See Monthly Labor Force Data for Cities and Census Designated Places February 2009*, State of California Employment Development Department (Mar. 20, 2009).

at 881-82. A prior three-judge panel of our court had ruled identically in issuing an injunction pending the merits hearing of this appeal. *Nelson v. NASA (Nelson I)*, 506 F.3d 713, 715 (9th Cir. 2007).

Judge Callahan writes that, "[u]ntil now, no court has held that applicants have a constitutionally protected right to privacy in information disclosed by employment references." This is a misstatement of our panel's holding. No "applicants" are members of the putative class, only existing long-term employees. Each class member, when hired, underwent extensive background checks, including employment references. The employees challenge now a newly proposed, free-floating, wide-ranging inquiry with no standards, limits, or guarantee of non-disclosure to third parties, for which the government intends to coerce a "release" by threatening the loss of their jobs. Contrary to Judge Callahan's representation, the newly proposed investigation is not limited to information "voluntarily turn[ed] over to third parties."[7] Some of the information sought from neighbors, landlords, employment supervisors, and the like includes private sexual practices, sexual orientation, and physical and psychological health issues, and the government does not ask sources to limit their answers only to information voluntarily shared by the subject person. Judge Callahan also suggests that our opinion protects information about drug treatment "in the face of a legitimate need

---

[7]Even if it was, Judge Callahan's contention misses the crucial point that the right to informational privacy and Fourth Amendment rights are not fully coextensive. See *Nelson II*, 530 F.3d at 880 n.5. In our opinion, we noted that although in the Fourth Amendment context there is a general principle " 'that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,' " *id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979), and citing *United States v. Miller*, 425 U.S. 435, 443 (1976)), "the 'legitimate expectation of privacy' described in this context is a term of art used only to define a 'search' under the Fourth Amendment, and *Miller* and *Smith* do not preclude an *informational privacy* challenge to government questioning of third parties about highly personal matters," *id.*

by the employer to protect the safety and security of a facili-
ty." The opinion does no such thing—rather, we specifically
noted that *in this context*, open-ended inquiries and questions
regarding drug treatment are not *narrowly tailored* to a legiti-
mate need to protect the facility. *Nelson II*, 530 F.3d at
880-81.

Our opinion is actually much narrower than Judge Callahan
would have her audience believe. Adhering to our precedent
in *In re Crawford*, 194 F.3d 954 (9th Cir. 1999) (holding that
public disclosure of Social Security numbers implicates the
right to informational privacy), *Norman-Bloodsaw v. Law-
rence Berkeley Laboratory*, 135 F.3d 1260 (9th Cir. 1998)
(holding that unauthorized employer testing for sensitive
medical information violates employees' right to informa-
tional privacy), *Doe v. Attorney General*, 941 F.2d 780 (9th
Cir. 1991) (holding that an individual's HIV-status is afforded
informational privacy protection and that the government may
seek and use such information only if its actions are narrowly
tailored to meet legitimate interests), and *Thorne v. City of El
Segundo*, 726 F.2d 459 (9th Cir. 1983) (holding that a poten-
tial employee of the state may not be required to disclose per-
sonal sexual matters to gain the benefits of state employment),
we concluded that only two aspects[8] of the government inqui-
ries in the challenged Standard Form 85 ("SF 85") question-
naire and Investigative Request for Personal Information
("Form 42") raised serious informational privacy concerns.
*Nelson II*, 530 F.3d at 879-81. After engaging in the requisite
delicate balancing, we reasoned that although the government
asserted several legitimate interests in investigating its con-
tract employees, it had failed to demonstrate that its inquiry
was narrowly tailored to meet those interests; further, the gov-
ernment asserted no legitimate interest to justify inquiries

---

[8]The class also challenged the investigation as lacking in statutory
authority under the Administrative Procedure Act, and argued that all
aspects of the investigation, including the Form 42 request and the entire
SF 85 questionnaire, were unconstitutional under the Fourth Amendment.

regarding drug treatment, as opposed to drug use. *Id.* We reversed the district court *only* to the extent that the government sought disclosure of "any treatment or counseling received" at *any* time for drug problems, *id.* at 879, and planned to engage in a free-ranging investigation of the most private aspects of class members' lives, *id.* at 880-81.

I.

The class challenges the limitless nature of the private information the government now seeks and the potential uses for this information. The newly instated NASA Procedural Requirements incorporate the Personal Identity Verification ("PIV") standard promulgated by the Department of Commerce under Homeland Security Presidential Directive 12 ("HSPD-12").[9] These requirements mandate that every JPL contract employee undergo a National Agency Check with Inquiries ("NACI") before he can obtain the new identification badge required for access to JPL facilities. As part of a NACI, JPL employees must submit SF 85, which seeks a host of information subsequently checked against four government databases, and sign an Authorization for Release of Information which permits the government to collect information about the employee. *Nelson II*, 530 F.3d at 870-71. The government collects information through Form 42.[10] *Id.* at 871. Once the information has been collected, NASA determines whether an employee is "suitable" for continued access to its facilities. *See* 5 C.F.R. § 731.103(a) ("[The U.S. Office of Personnel Management] delegates to the heads of agencies

---

[9]HSPD-12 was issued in response to identity fraud concerns raised by the 9/11 Commission. It directed the U.S. Secretary of Commerce to develop a uniform "standard for secure and reliable forms of identification." Directive on Policy for a Common Identification Standard for Federal Employees and Contractors, 2004 Pub. Papers 1765, 1765 (Aug. 27, 2004).

[10]The information requested in SF 85 and Form 42 and the scope of the Authorization for Release of Information are described in our opinion. *See Nelson II*, 530 F.3d at 871.

authority for making suitability determinations and taking suitability actions."). Because Caltech established a policy that JPL employees who fail to obtain new identification badges will be terminated, a negative suitability determination results in the loss of employment with attendant harm to the employee's career.

There is nothing in the record to support Judge Callahan's statement that the government inquiry in Form 42 is limited in any way to information that class members "voluntarily turn over to third parties." The record demonstrates the contrary: the Authorization for Release of Information authorizes any investigator conducting a background check using Form 42 to obtain information not only from past employers, landlords, and educational institutions, but also from any other sources of information that the investigator wants to consider. And, contrary to Judge Kleinfeld's suggestion, the release specifically states that the investigation is *not* limited to these sources. "[T]he form invites the recipient to reveal *any* negative information of which he or she is aware," no matter how that "information" fell into the hands of the source. *Nelson II*, 530 F.3d at 881. Judge Kleinfeld also belabors the usefulness of open-ended questions when an employer interviews a potential employee, but misses the distinction between that necessary practice and the standardless and limitless mining of highly personal and employment-irrelevant data from third parties at issue here. There are serious questions as to whether such open-ended inquiries are invasive of privacy rights; reasonable reference checks and interviewing techniques, on the other hand, remain within the government's prerogative.

Moreover, the record suggests that the government will seek private information unrelated to employment and use such information to determine suitability for employment. At multiple meetings about the new procedures, class members specifically asked about the investigation's scope and the criteria analyzed to make the suitability determination. The program directors refused to answer questions about scope

and criteria. The only information class members were able to glean about the proposed use of SF 85 and Form 42 and the suitability determination came from a document accidentally posted on the JPL internal HSPD-12 website between about August 2, 2007, and September 11, 2007.

The document, entitled "Issue Characterization Chart," listed "sodomy," "carnal knowledge," "abusive language," "personality conflict," "bad check," "credit history," "physical health issues," and "mental, emotional, psychological or psychiatric issues" as suitability issues. The Issue Characterization Chart further indicates that "[h]omosexuality, in and of itself, while not a suitability issue, may be a security issue and *must be addressed completely*, when indications are present of possible susceptibility to coercion or blackmail" (emphasis added). Far from the minimally intrusive questions to former employers and named references that Judges Callahan and Kleinfeld portray, the record shows the very real potential for intrusions into undisclosed private sexual, financial, and health matters and the use of those private matters to determine job suitability. As our opinion states, "[t]he record is vague as to the exact extent to and manner in which the government will seek this information." *Id.* at 871.

Judge Callahan represents that the safety and security of federal facilities is implicated by enjoining the government from a limitless investigation into the class members' private lives. In a similar vein, Judge Kleinfeld suggests that our opinion "enjoin[ed] reasonable reference checks on applicants for federal government functions" in a manner "likely to impair national security." In addition to the fact that this accusation again mistakenly focuses on applicants, whereas our opinion addressed existing employees, Judge Kleinfeld's and Judge Callahan's claims are simply unsupportable. Our opinion did not issue a blanket injunction against the use of Form 42—we held only that the use of this Form to investigate low risk, existing contract employees raises serious legal questions. The government is obviously free to continue reason-

able reference checks, and is even free to utilize Form 42 when the government's legitimate interests in investigation are sufficiently great and when the government adheres to proper limiting standards that narrowly tailor its quest for information. The fact that this Form may be frequently and appropriately used in other contexts does not mean that it would be proper here. Further, the opinion does not "forbid[ ] the government from making inquiries," as Judge Kleinfeld suggests. Nor does it affect the government's ability to confirm identity, take fingerprints, run criminal records checks, or compel individuals to disclose prior drug use. It preliminarily enjoins the government only from compelling the disclosure of any and all drug counseling and treatment information and from investigating without limits into areas of class members' lives unrelated to employment.

Judge Kleinfeld's complaint that we failed to consider the public interest in national security is similarly misguided. Our explanation of the nature of plaintiffs' low risk positions which do not involve public safety or a significant risk for causing damage, *id.* at 880-81, our careful analysis of the non-sensitive nature of their work, *id.*, our admonition that our decision "would not affect NASA's ability to investigate [employees] in 'high risk' or 'moderate risk' positions," *id.* at 882, and the notation that many successful years passed before NASA decided to implement NACI,[11] *id.*, reflect our reasoned decision that national security is not implicated by the grant of a preliminary injunction. It is also worth noting that throughout this litigation the government itself has never argued the public interest in national security as a justification for its proposed background investigation.

The JPL, a research laboratory run jointly by NASA and

---

[11]Judge Kleinfeld misreads the record when he asserts that our injunction "stops the government from making the inquiries it has been making for decades"—the government concedes that it sought to impose the wide-ranging background check only as of 2007.

Caltech, is not a vulnerable facility desperately in need of stronger security measures. JPL is located approximately five minutes to the north of our Pasadena courthouse off Interstate 210, and a large freeway sign directs the traveling public to the facility. JPL operates as a university campus rather than as a high-security government facility, encouraging students, visiting scientists (often foreign nationals), and other members of the public to enter and tour the facilities. JPL regularly opens its doors to all members of the public. Tens of thousands of visitors have unrestricted access to the lab with no requirement that they present identification.

When visitors arrive at the campus, they encounter only cursory random inspections of cars. Guards wave passenger cars through and take a quick peek inside trucks and busses. Drivers of trucks with chemicals and equipment park on campus while their identity is verified by presentation of a driver's license. Once a driver's identity is checked, the truck driver pulls right up to the buildings, a privilege enjoyed by less than thirty percent of the permanently badged employees. There are no metal detectors and no inspections of handbags.

While there are millions of dollars in taxpayer money invested in this facility and its operations, any risk that may exist derives from the complexity and unknown character of the subjects of JPL's exploration, not security concerns. JPL protects expensive government equipment with Flight Project Practices that govern every aspect of a mission's design, development, testing, and operations. These Practices require all critical activities to be peer-reviewed and independently validated. They are not affected by the issuance of new identification badges.

While the preliminary injunction remains in effect, the public may rest assured that the class members, many of whom have worked at JPL and Caltech for twenty to thirty years, have undergone serious security checks, which the government found sufficient to safeguard our national space effort

up until two years ago when it first decided to impose its proposed limitless inquiry. A temporary restriction against a standardless investigation of employment-irrelevant data will have little to no impact on JPL, in part because of the security measures already in effect.

JPL currently uses secure and reliable forms of identification that comply with HSPD-12. HSPD-12 defines "secure and reliable forms of identification" as identification that "(a) is issued based on sound criteria for verifying an individual employee's identity; (b) is strongly resistant to identity fraud, tampering, counterfeiting, and terrorist exploitation; (c) can be rapidly authenticated electronically; and (d) is issued only by providers whose reliability has been established by an official accreditation process." 2004 Pub. Papers at 1766. Every contract employee entering the JPL facility must wear an appropriate badge that includes his photograph, an employee number, and a bar code. The "One NASA" badge, which NASA began issuing in response to HSPD-12, requires personal information, two forms of approved identification, and fingerprinting. The class does not challenge uniform identification measures or the requirements for obtaining a "One NASA" badge.

Judges Callahan and Kleinfeld fail to articulate how the two narrow aspects of the additional investigation sought by the government and temporarily enjoined impair national security. Surely, whether a Caltech scientist had "carnal knowledge," a personality conflict, or used abusive language at home would not impact our national security. Put another way, the dissenters (other than Judge Kozinski) seem to be suggesting that the government has an unlimited right to violate the most fundamental privacy interests of its contract employees because almost anything might affect national security. At a minimum, this is a serious legal question. That NASA has existed for more than fifty years without these inquiries, *see Nelson II*, 530 F.3d at 871, that the challenged program was implemented almost eight years after the gov-

ernment determined it should have more complete screening of contract employees, *id.*, and that class members are long-term employees of JPL who have previously undergone significant security checks, suggest that remand was appropriate to develop the record further and to allow class members to pursue their claim on an orderly basis.

## II.

Judge Callahan asserts that our opinion diverges from the reasoning of two decisions by our sister circuits, *National Treasury Employees Union v. U.S. Department of Treasury*, 25 F.3d 237 (5th Cir. 1994), and *American Federation of Government Employees v. Department of Housing and Urban Development*, 118 F.3d 786 (D.C. Cir. 1997). Judge Callahan is incorrect. Both decisions are specifically grounded in the diminished privacy interests of individuals in public trust positions—positions not held by the low risk contract employees here.

In *National Treasury*, the Fifth Circuit recognized the constitutional right to privacy, stating that "[t]he extent to which an individual's expectation of privacy in the employment context is reasonable depends, in significant part, upon the employee's position and duties." 25 F.3d at 243-44. The Fifth Circuit emphasized that the plaintiffs, all of whom held positions at the high and moderate risk levels, were "public trust employees." *Id.* at 244. Public trust positions "involve policy-making, major program responsibility, public safety and health, law enforcement duties, fiduciary responsibilities or other duties demanding a significant degree of public trust, and positions involving access to or operation or control of financial records, with a significant risk for causing damage or realizing personal gain." 5 C.F.R. § 731.106(b). Because "public trust employees know that they have diminished rights to withhold personal information that compromises the right of the public to repose trust and confidence in them," the Fifth Circuit concluded that they must complete the Standard

Form 85P, Questionnaire for Public Trust Positions ("SF 85P"). *Nat'l Treasury*, 25 F.3d at 244. The Fifth Circuit also stated, "[w]e take pains to underscore the obvious: we are determining rights of [plaintiffs] in their capacity as public trust employees and certainly not in their role as ordinary private citizens." *Id.*

In *American Federation*, the D.C. Circuit also considered informational privacy in the context of public trust employees. 118 F.3d at 788. There, employees were found to be in public trust positions because of their access to a database that controlled $10 billion in annual government disbursements. *Id.* The D.C. Circuit analyzed each of the challenged questions, as we did in our opinion, and concluded that the agency provided "sufficiently important justifications for each item on the questionnaires" in light of the employees' diminished expectation of privacy as public trust employees. *Id.* at 793.

The class members here are low risk and thus do not have the diminished expectation of privacy of public trust employees. The class expressly excludes employees who have been designated as moderate or high risk. Many class members agreed to work for NASA with the understanding that they would not be required to work on classified materials or to obtain security clearances—precisely because they desired that their work remain in the public domain. Avoiding classified materials allows these scientists to subject their work to peer review, to collaborate with the best scientists worldwide, and to publish their results.

Although the Fifth and D.C. Circuits recognized that one factor that can diminish an individual's privacy interest is whether the information collected by the government is disseminated publicly, *Nat'l Treasury*, 25 F.3d at 244; *Am. Fed'n*, 118 F.3d at 793, neither one found that to be the dispositive factor. Each court held that constitutional interests were not violated because the protections against the disclosure of private information were combined with other important fac-

tors, such as the diminished expectation of privacy by individuals holding public trust positions. *Nat'l Treasury*, 25 F.3d at 244; *Am. Fed'n*, 118 F.3d at 794. Our opinion also recognizes that "[a]lthough the risk of public disclosure is undoubtedly an important consideration in our analysis, it is only one of many factors that we should consider." *Nelson II*, 530 F.3d at 880 (citation omitted). Moreover, plaintiffs have been informed that the information will be disclosed to Caltech, raising serious questions as to whether their privacy interest is diminished by this factor.

Finally, both *National Treasury* and *American Federation* were decided on a fully developed factual record that included a reasoned decision of the district court. The evidentiary record was critical to the courts' decisions. For example, after the district court held that an authorization similar to that in SF 85 violated the plaintiffs' constitutional right to informational privacy in *American Federation*, the D.C. Circuit reversed based on a government representation "that the legitimate use of the release form is limited to verifying information solicited by other parts of the form," and a finding that "the release authorizes the government to collect only information 'relevant' to determining the fitness of an individual for a public trust position." *Am. Fed'n*, 118 F.3d at 794. In contrast, here, the government "steadfastly refused to provide any standards narrowly tailoring the investigation to the legitimate interests they offer as justification," failing to limit the investigation to relevant information or the verification of responses. *Nelson II*, 530 F.3d at 881.

## III.

Chief Judge Kozinski's dissent thoughtfully raises a number of considerations to be taken into account in shaping the right of informational privacy. By asking a series of provocative questions about the doctrine, however, he only underscores our panel's conclusions that serious questions were raised justifying the preliminary injunction. *See Walczak*, 198

F.3d at 731. Ultimately, I disagree with his conclusion that we should have taken this case en banc to provide further guide-posts towards resolving those questions. Erecting guideposts on a moving playing field would prove futile. Only a fully developed factual record, such as the one in *National Treasury* or *American Federation*, will allow us to thoroughly consider the nature of the privacy rights at issue and provide the clarity Judge Kozinski seeks.

We recognized in our opinion the distinction Judge Kozinski proposes between government collection and disclosure of information. As previously noted, we stated that "[a]lthough the risk of public disclosure is undoubtedly an important consideration in our analysis, it is only one of many factors that we should consider." *Nelson II*, 530 F.3d at 880 (citation omitted). It is not yet clear on this record, however, whether the government intends to disclose the information it collects. The class has specifically alleged that NASA will share the information collected with Caltech and possibly with other government agencies. Sharing this information with Caltech and other agencies is a potential violation of the Privacy Act. *See* 5 U.S.C. § 552a(b) (forbidding agency disclosure of records "to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains"). Moreover, if the information is shared, Caltech is not precluded by the Privacy Act from further disseminating it.

Judge Kozinski also distinguishes between disclosures that the target may refuse and those imposed regardless of his consent. I agree that during the application process for a new job, disclosures may be refused simply by seeking other employment. In that context, requested disclosures may be inherently less invasive. Here, however, we have long-term employees suddenly forced to sign releases authorizing investigation into every aspect of their private lives or lose their jobs. As a practical matter, given the current economic environment, the unique nature of the work conducted at JPL, and the age and

seniority of the plaintiff-employees, this is tantamount to a deprivation of the ability to obtain any future employment.

Judge Kozinski's third distinction—the difference between protecting fundamental rights and protecting a free-standing right not to have the world know bad things about you— would also be addressed more precisely with further record development. It appears, although it has yet to be conclusively proven, that the government intends to pry into constitutionally protected private matters. The Issue Characterization Chart suggests that sexual preference, sexual activity, medical treatment, counseling, and personal financial matters are at issue in the government's investigation. The Supreme Court has recognized a constitutional "interest in avoiding disclosure of personal matters," *Whalen v. Roe*, 429 U.S. 589, 591-93 (1977), and we and our sister circuits have defined this right to include the very types of matters implicated by the Issue Characterization Chart, *see, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000) ("While we have not previously confronted whether forced disclosure of one's sexual orientation would be protected by the right to privacy, we agree with other courts concluding that such information is intrinsically private."); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999) ("[T]his Court has recognized the existence of a constitutionally protected interest in the confidentiality of personal financial information."); *Norman-Bloodsaw*, 135 F.3d at 1269 ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."); *Eastwood v. Dep't of Corr.*, 846 F.2d 627, 631 (10th Cir. 1988) ("This constitutionally protected right [to privacy] is implicated when an individual is forced to disclose information regarding personal sexual matters."); *Thorne*, 726 F.2d at 468 ("The interest [the plaintiff] raises in the privacy of her sexual activities are within the zone protected by the constitution.").[12]

---

[12]*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), the case cited by Judge Kozinski to illustrate this third distinction, suggests that intimate details

Similarly, the parties have yet to develop an evidentiary record as to whether the government intends to "dig into records" or simply to contact third parties. The government states that it would need another release to obtain medical records. However, the Authorization for Release of Information allows the government "to obtain any information relating to [a class member's] activities from . . . other sources of information" and to seek information that "is not limited to" job-related activities. The Issue Characterization Chart suggests that the government may pursue the more invasive of these two approaches. There is no evidence of what standards, if any, the government intends to apply.

Further record development is also required to determine whether the government is in fact acting as any other "private" employer. By unilaterally imposing the new requirements upon Caltech in the interest of securing federal facilities, the government is using special powers that are available to it only in its sovereign capacity. Private contracting parties would not have the ability to insist upon one-sided contract modifications that result in termination of a partner's employees of twenty or thirty years. Moreover, it appears that NASA—not Caltech—will make the suitability determination, but again, the class has not yet had the opportunity to submit evidence on this point.

We must rule on the record we have before us. Our ability to "clear the brush" will be enhanced when the record is fully developed. Even the Supreme Court would find it a much surer task to outline the contours of the doctrine of informational privacy with some of Judge Kozinski's questions actually answered. Therefore, I concur in the denial of en banc rehearing, and await the next round.

---

about sexuality and choices about sex are the type of private matters which implicate the constitutional right to privacy. *Id.* at 685. How these private matters play into this dispute requires further factual development.

CALLAHAN, Circuit Judge, with whom KLEINFELD, TAL-LMAN and BEA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

This case places before the court an issue of exceptional importance: the degree to which the government can protect the safety and security of federal facilities. With an annual budget of over $1.6 billion, NASA's Jet Propulsion Laboratory ("JPL") is the foremost leader in exploring the solar system's known planets with robotic spacecraft. As the lead center for NASA's deep space robotics and deep space communications missions, the science and technology developed at JPL for each mission entails extensive planning, research, and development, spanning years and costing taxpayers hundreds of millions of dollars. The technology developed at JPL features some of the most sensitive and expensive equipment owned by NASA, which involves a myriad of scientific, medical, industrial, commercial, and military uses.

Plaintiffs, twenty-eight scientists and engineers employed as contractors at JPL, object to NASA's requirement that they undergo the same personnel investigation for non-sensitive contract employees as those already in existence for all civil service employees in non-sensitive positions. Although the district court denied a motion for a preliminary injunction designed to prevent these personnel investigations from taking place, a panel of this court reversed, concluding that the district court's decision was based on legal errors. *See Nelson v. NASA*, 530 F.3d 865 (9th Cir. 2008). The panel held that a questionnaire asking applicants about treatment or counseling received for illegal drug use within the past year and a related written inquiry sent to references implicate the constitutional right to informational privacy. *See id.* at 879. Applying intermediate scrutiny, the panel held that the government did not have a legitimate state interest in asking applicants to disclose their drug treatment or counseling history, *id.*, and that the written inquiry was not narrowly tailored to serve the

government's legitimate interests related to the security of JPL. *Id.* at 879-81.

I dissent from the denial of rehearing en banc because the panel's opinion constitutes an unprecedented expansion of the constitutional right to informational privacy. Further, assuming that the panel's opinion correctly assesses the scope of this right, it does not properly apply intermediate scrutiny. This expansion of constitutional privacy rights reaches well beyond this case and may undermine personnel background investigations performed daily by federal, state, and local governments.

Until now, no court had held that applicants have a constitutionally protected right to privacy in information disclosed by employment references. The Supreme Court has consistently held that individuals do not have a legitimate expectation of privacy in information they voluntarily turn over to third parties. *See, e.g.*, *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979); *United States v. Miller*, 425 U.S. 435, 442-44 (1976). Similarly, no court had previously held that a government employee has a constitutionally protected right to privacy to prevent the disclosure of treatment or counseling received for illegal drug use in the face of a legitimate need by the employer to protect the safety and security of a facility. *Cf. Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986) (finding that disclosure of drug use cannot violate constitutional right to informational privacy). Thus, the panel's opinion effects an unwarranted extension of the constitutional right to informational privacy.

Even assuming that a constitutional right to information privacy is implicated here, the panel fails to engage in the requisite "delicate balancing" of plaintiffs' privacy rights and NASA's legitimate need for information ensuring that those it trusts with access to JPL do not pose an unacceptable safety and security risk. The panel's opinion sets our circuit apart from the District of Columbia Circuit and Fifth Circuit, both

of which have rejected privacy-based challenges to background checks similar to, or more intrusive than, the one here. *See Am. Fed'n of Gov't Employees v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786 (D.C. Cir. 1997); *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237 (5th Cir. 1994). These circuits emphasized that the information to be disclosed to the government in those cases would not be disclosed to the public; indeed, the D.C. Circuit recognized that even if a constitutional right to informational privacy is implicated, the Privacy Act, 5 U.S.C. § 552a(b), adequately safeguards against public disclosure.

## I.    Factual Background

### A.    Work conducted at the JPL facilities

JPL is a NASA facility that the California Institute of Technology ("Caltech") operates pursuant to a contract with NASA, and its facilities are an integral part of the nation's space program. JPL is the lead center for NASA's deep space robotics and deep space communications missions, which require broad access to many NASA physical and logical facilities. These missions entail "extensive and detailed parallel planning, research, and development, often spanning years, scores of persons, and hundreds of millions of taxpayer dollars." JPL's discoveries have provided new insights into studies of the Earth, its atmosphere, climate, oceans, geology, and the biosphere; created the most accurate topographic map of the Earth; provided insight into global climate and ozone depletion; launched an oceanographic satellite to provide new details about the ocean seafloor; and provided space-based operational, communication, and information processing for the Defense Department. JPL operates a number of high profile projects including the Phoenix Mars Lander Mission, the Mars Exploration Rovers Mission, the Cassini Equinox Mission to Saturn, and the Voyager Mission to Jupiter, Saturn and beyond. The command center for the Mars Rovers, the Space Flight Operations Center for JPL missions, and JPL's Space

Craft Assembly building are located on the JPL campus. JPL also partially manages the Deep Space Network, which is responsible for monitoring and communicating with numerous satellites and other space missions, and is involved in other highly confidential projects.

All positions at JPL, from administrative support to engineers, scientists, and JPL's Director, are filled by contract employees.[1] Plaintiffs are scientists and engineers employed in some of the most important positions at JPL, including the remote operator of the Spirit and Opportunity Rovers that explore the surface of Mars and a navigation team member for the Phoenix Mars Lander Mission.

## B.    Implementation of Homeland Security Presidential Directive 12

The 9/11 Commission found that "[a]ll but one of the 9/11 hijackers acquired some form of U.S. identification document, some by fraud," and recommended that the federal government set standards for the issuance of identification because identification fraud is a concern at "vulnerable facilities." THE 9/11 COMMISSION REPORT 390 (2004). On August 27, 2004, the President of the United States issued Homeland Security Presidential Directive 12 ("HSPD-12") in response to security concerns identified by the 9/11 Commission Report and mandated that the Commerce Department develop a uniform federal standard, applicable to federal employees and contractors alike, for secure and reliable forms of identification. The order emphasized that the Commerce Department should act to eliminate the "[w]ide variations in the quality and security of forms of identification used to gain access to secure Federal and other facilities where there is potential for terrorist attacks . . . ." HSPD-12 ¶ 1.

---

[1]Caltech has filled JPL positions with about 5,000 of its own employees and with over 4,000 "affiliates" and contractors.

Acting pursuant to this directive, the Commerce Department promulgated Federal Information Processing Standards ("FIPS") 201 and 201-1, which required security measures for contract employees commensurate with those applicable to comparable federal employees. FIPS 201-1 sets forth a standard for "identification issued by Federal departments and agencies to Federal employees and contractors (including contractor employees) for gaining physical access to federally-controlled facilities and logical access to Federally controlled information systems."

Since 1953, federal civil service employees have been subject to mandatory background investigations, with the scope varying based on the potential for adverse security consequences associated with a particular position. *See* Exec. Order No. 10,450, 18 Fed. Reg. 2489 (Apr. 29, 1953), *reprinted as amended in* 5 U.S.C. § 7311 (2007). Thus, for over fifty years, Executive Order 10,450 has required that "in no event shall the investigation [of civil service employees] include less than a national agency check (including a check of the fingerprint files of the Federal Bureau of Investigation), and written inquiries to appropriate local law-enforcement agencies, former employers and supervisors, references, and schools attended by the person." *Id*. § 3(a). Now, under FIPS 201-1, federal contractors in non-sensitive positions must meet these same minimum security guidelines.

In 2001, before the promulgation of FIPS 201, NASA conducted an internal review of contractor security requirements and concluded that the failure of contractors to undergo background checks posed a vulnerability. NASA, acting pursuant to its statutory authority under the National Aeronautics and Space Act of 1958 (the "Space Act") to conduct "personnel investigations," revised NASA Procedural Requirement ("NPR") 1600.1, to require application of security requirements for contract employees parallel to those of federal employees. On November 8, 2005, NASA updated NPR 1600.1 to incorporate FIPS 201 and require that all low risk

contractors be subject to a National Agency Check with Inquiries ("NACI") prior to the issuance of permanent NASA photo-identification. NASA explained that these requirements would "assist NASA Centers and component facilities in executing the NASA security program to protect people, property, and information" by establishing "security program standards and specifications necessary to achieve Agency-wide security program consistency and uniformity." NPR 1600.1, § P.1.

Meanwhile, on August 5, 2005, the Office of Management and Budget ("OMB") provided guidance on the implementation of HSPD-12, requiring agencies "develop a plan and begin the required background investigations for all current contractors who do not have a successfully adjudicated investigation on record . . . no later than October 27, 2007." Memorandum from OMB on Implementation of Homeland Sec. Presidential Directive (HSPD) 12 — Policy for a Common Identification Standard for Fed. Employees and Contractors 6 (Aug. 5, 2005). OMB stated that the completion of a NACI would be a prerequisite to the issuance of any identification. *Id.* at 5. Across all NASA facilities, over 57,000 individuals are subject to these new requirements, over 46,000 had applied as of August 31, 2007, and approximately 39,000 NASA contractors had completed the background investigation as of September 21, 2007.

## C.   The SF-85 Questionnaire and the Form 42 inquiries

The NACI requires the completion of a SF-85 Questionnaire, which asks the applicant to answer basic questions regarding citizenship, previous residences over the past five years, educational background, employment history over the past five years, selective service record, military history, and illegal drug use over the past year.[2] The panel took issue with Question #14, which asks:

---

[2]The SF-85 also includes an "Authorization for Release of Information," which may be used only for purposes of the SF-85 and is limited by the Privacy Act.

In the last year, have you used, possessed, supplied, or manufactured illegal drugs? When used without a prescription, illegal drugs include marijuana, cocaine, hashish, narcotics (opium, morphine, codeine, heroin, etc.), stimulants (cocaine, amphetamines, etc.), depressants (barbiturates, methaqualone, tranquilizers, etc.), hallucinogenics (LSD, PCP, etc.). (NOTE: Neither your truthful response nor information derived from your response will be used as evidence against you in any subsequent criminal proceeding.)

If you answered "Yes," provide information relating to the types of substance(s), the nature of the activity, and any other details relating to your involvement with illegal drugs. Include any treatment or counseling received.

The SF-85 also asks for three references who know the applicant well. Form 42 written inquiries are then sent to educational institutions, former employers, landlords, and the designated references in order to verify the information on the SF-85 and confirm the applicant's trustworthiness and compliance with the law. Question #7 on Form 42 asks references to indicate either "Yes" or "No" as to whether they "have any adverse information about this person's employment, residence or activities concerning:" "Violations of the Law," "Financial Integrity," "Abuse of Alcohol and/or Drugs," "Mental or Emotional Stability," "General Behavior or Conduct," or "Other Matters." References are then asked whether they "wish to discuss the adverse information [they] have." If so, they can provide "additional information which [they] feel may have a bearing on this person's suitability for government employment or a security clearance. This space may be used for derogatory as well as positive information." Form 42 written inquiries are sent to roughly 980,000 recipients annually. 70 Fed. Reg. 61,320 (Oct. 21, 2005).

## D.  Procedural History

Plaintiffs filed suit on August 30, 2007, and subsequently moved for a preliminary injunction. The district court denied the plaintiffs' motion on a number of grounds, rejecting the plaintiffs' claims that NASA lacked the statutory authority to conduct these investigations, and that the NACI violated plaintiffs' informational privacy rights. The district court found that the NACI served a legitimate governmental interest, *i.e.*, to enhance security at federal facilities. Finding the NACI narrowly tailored with adequate safeguards in place, the court concluded that the government must be given some leeway in conducting its investigation to verify that applicants are not connected to activities that pose a security threat.

Plaintiffs filed an emergency motion for a stay of the district court's order. A panel of this court granted a temporary stay pending appeal. *Nelson v. NASA*, 506 F.3d 713 (9th Cir. 2007). Following an expedited briefing schedule and argument, a merits panel held that the district court abused its discretion and reversed the denial of the preliminary injunction. *Nelson v. NASA*, 512 F.3d 1134 (9th Cir. 2008).

Subsequently, the panel vacated its opinion and filed a superseding opinion. *Nelson v. NASA*, 530 F.3d 865 (9th Cir. 2008) ("*Nelson II*"). The panel's opinion concludes that "the Space Act appears to grant NASA the statutory authority to require the [background] investigations," *id.* at 875, and that the portion of SF-85's Question #14 requiring disclosure of prior drug use, possession, supply, and manufacture does not violate the plaintiffs' constitutional right to informational privacy. *Id.* at 878-79. However, the panel held that the portion of SF-85's Question #14 requiring applicants to disclose "any treatment or counseling received" for illegal drug use, *id.* at 879, and Form 42's written inquiries violate the plaintiffs' constitutional right to informational privacy. *Id.* at 879-81. Accordingly, the panel concluded that "[t]he district court's denial of the preliminary injunction was based on errors of

law and hence was an abuse of discretion" and ordered the district court to issue an injunction. *Id.* at 883.

## II.   Discussion

### A.   The panel's expansion of the constitutional right to informational privacy is unprecedented

While the Supreme Court has never clearly addressed whether there is a constitutional right of privacy in the non-disclosure of personal information, *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)*; Whalen v. Roe*, 429 U.S. 589, 605-06 (1977), this circuit — along with a majority of other circuits — has found a limited right to informational privacy.[3] *See In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). We have said that constitutionally protected privacy interests include "avoiding disclosure of personal matters" and an "interest in independence in making certain kinds of important decisions." *Id.* (citations omitted). "The right to informational privacy, however, is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Id.* at 959 (internal quotation marks and citation omitted). Where a constitutional right to informational privacy is implicated, we apply intermediate scrutiny, which requires the government to show that "its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Id.* (internal quotation marks and citation omitted).

---

[3]The Sixth Circuit appears to be the only circuit to reject this view. *See Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999). In addition, recognizing that it was not writing on a "blank slate" because earlier decisions indicated that such a right existed, the District of Columbia Circuit has expressed "grave doubts" as to the existence of a federal right of confidentiality. *See Am. Fed'n of Gov't Employees*, 118 F.3d at 791. The First Circuit has similarly expressed concern, but declined to address the issue. *See Borucki v. Ryan*, 827 F.2d 836, 841-42 (1st Cir. 1987).

For example, we have held that an employer's non-consensual pre-employment blood testing for syphilis, sickle cell genetic trait, and pregnancy implicated a constitutionally protected privacy interest in avoiding disclosure of personal, confidential medical information. *See Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269-70 (9th Cir. 1998). We have also held that a physician has a right to privacy in revealing whether he or she has AIDS to prospective patients. *See Doe v. Att'y Gen.*, 941 F.2d 780, 796 (9th Cir. 1991). Further, we have held that a female minor has a privacy interest in avoiding disclosure of the fact that she is pregnant as part of a judicial bypass proceeding used as an alternative to parental consent. *See Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002). We have also stated that questions during a polygraph given to a police officer applicant asking about a possible abortion and the identity of her sexual partners implicated this privacy right. *See Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir. 1983). And, we have held that a constitutional right of informational privacy may extend to the indiscriminate public disclosure of social security numbers out of a fear of identity theft. *See In re Crawford*, 194 F.3d at 958. Never before, however, has a court concluded that a government worker employed in a secure facility has a constitutional right of privacy to prevent the government from inquiring into whether that employee has received drug treatment within the past year or to prevent the government from sending a questionnaire to references in order to verify the veracity of the employee.

1. **There is no expectation of privacy in information disclosed by a designated reference responding to a questionnaire**

The panel's opinion concludes that individuals have a constitutionally protected right to privacy in information disclosed to third-party employment references. No other court has held as much, and for good reason — the Supreme Court

"consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith*, 442 U.S. at 743-44 (citing *Miller*, 425 U.S. at 442-44; *Couch v. United States*, 409 U.S. 322, 335-36 (1973); *United States v. White*, 401 U.S. 745, 752 (1971) (plurality opinion); *Hoffa v. United States*, 385 U.S. 293, 302 (1966); *Lopez v. United States*, 373 U.S. 427 (1963)); *see also SEC v. O'Brien*, 467 U.S. 735, 743 (1984) (same). For example, the *Miller* Court held that a bank depositor did not have an expectation of privacy in financial information that he voluntarily turned over to banks and their employees in the normal course of business. The Court explained:

> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities*, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. at 443 (emphasis added and citations omitted). Absent some privilege (*e.g.*, attorney-client, physician-patient, priest-penitent, marital, etc.), an applicant does not have an expectation of privacy to information disclosed by a reference.

The panel concludes that Fourth Amendment case law defining whether an individual has an expectation of privacy over information that he has already disseminated to the public is not the proper focus in the evaluation of information privacy rights and contends that, instead, we should focus on the general nature of the information sought. *See Nelson II*, 530 F.3d at 880 n.5. Although I agree with the panel that the constitutional right to informational privacy is not limited to

Fourth Amendment searches, *see, e.g.*, *Thorne*, 726 F.2d at 468 (questions during a polygraph to a police applicant), I disagree with the suggestion that whether an individual has an expectation of privacy under a constitutional right to informational privacy is not informed by Supreme Court case law interpreting an expectation of privacy under the Fourth Amendment. In fact, one of the Supreme Court's first decisions recognizing a constitutional right to informational privacy specifically cited to Fourth Amendment case law in defining this right. *See Nixon*, 433 U.S. at 457-58 (citing *Katz v. United States*, 389 U.S. 347, 351-53 (1967), in evaluating whether President Nixon had a legitimate expectation of privacy over presidential papers and tape recordings).

The panel's expansion of the constitutional right to privacy and what constitutes a legitimate expectation of privacy is unprecedented. The Supreme Court has planted a set of "guideposts for responsible decisionmaking" concerning limited fundamental rights "deeply rooted in this Nation's history and tradition" in an attempt "to rein in the subjective elements that are necessarily present in due-process judicial review." *Washington v. Glucksberg*, 521 U.S. 702, 720-22 (1997) (citations and quotation marks omitted). "[I]n addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* at 720 (citations omitted); *see also Thorne*, 726 F.2d at 468 (stating that informational privacy claims must fall within the zone protected by the constitution). "[E]stablishing a threshold requirement . . . avoids the need for complex balancing of competing interests in every case." *Glucksberg*, 521 U.S. at 722. The panel's opinion expands the right to informational privacy by elevating personnel investigations to the realm of constitutional protection.

The panel's opinion opens the doors to lawsuits against employers who perform standard reference checks to ensure

that applicants are suitable candidates for employment. In an area where States have sought measures to promote the free flow of information, *see, e.g.*, *Noel v. River Hills Wilsons, Inc.*, 7 Cal. Rptr. 3d 216, 220-21 (Ct. App. 2003) (recognizing that a California state statute extending a conditional privilege against defamatory statements applies in the employment context), the panel's opinion will have the opposite effect.

The panel's opinion also fails to adhere to the Supreme Court's recent admonition that there is "a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.' " *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2151 (2008) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961) (rejecting Fifth Amendment due process claim of civilian contractor summarily denied access to military facility for security reasons)). As the Court stated in *Engquist*, "in striking the appropriate balance" between employee rights and the government's needs as an employer, courts should "consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." *Id.* at 2152.

The constitutional right to informational privacy allows individuals to safeguard certain private information — like the fact that they have had an abortion or have contracted AIDS — and ensures that those wishing to keep such information from the eyes and ears of others can do so. However, those individuals that disclose such information to people like their landlords or employers lack any expectation that such information will be kept private. For this reason, plaintiffs have no expectation of privacy with respect to the Form 42 written inquiries.

### 2. There is no expectation of privacy for prior drug treatment or counseling when seeking employment with the government

The panel's opinion recognizes that the constitutional right to informational privacy does not protect an applicant from having to disclose to the government in a background investigation whether they have used, possessed, supplied, or manufactured illegal drugs within the past year. *Nelson II*, 530 F.3d at 878-79. However, the panel maintains that the plaintiffs are likely to succeed on their informational privacy challenge to a follow-up question regarding the disclosure of "any treatment or counseling received" for illegal drug use once an applicant acknowledges involvement with illegal drugs in the past year. *Id.* at 879.

The panel's position is predicated on the assertion that "[i]nformation relating to medical treatment and psychological counseling fall squarely within the domain protected by the constitutional right to informational privacy." *Id.* (citing *Norman-Bloodsaw*, 135 F.3d at 1269, and *Doe*, 941 F.2d at 796). However, the authority the panel cites — *Norman-Bloodsaw* and *Doe* — respectively deal with the "highly private and sensitive medical and genetic information" from non-consensual pre-employment blood testing for syphilis, sickle cell genetic trait, and pregnancy, *see Norman-Bloodsaw*, 135 F.3d at 1264, 1269, and whether a doctor must disclose to patients that he has AIDS, *see Doe*, 941 F.2d at 796. We held in those cases that the constitutional right to informational privacy protects those individuals from having such highly private medical information enter the public domain. But here, the panel agrees that an applicant does not have a constitutional right to shield from the government the fact that he has used illegal drugs.

In *National Treasury Employees Union*, the Fifth Circuit noted that a public employee's expectation of privacy "depends, in part, upon society's established values and its

expectations of its public servants, as reflected in our repre-
sentative government." 25 F.3d at 243. Observing that
"[t]oday's society has made the bold and unequivocal state-
ment that illegal substance abuse will not be tolerated," the
court held that "[s]urely anyone who works for the govern-
ment has a diminished expectation that his drug and alcohol
abuse history can be kept secret, given that he works for the
very government that has declared war on substance abuse."
*Id.* I see no principled distinction between an applicant having
to disclose that he has used illegal drugs and having to addi-
tionally indicate whether he sought treatment or counseling
for illegal drug use. In *Mangels*, the Tenth Circuit, assessing
the constitutionality of a requirement of public disclosure of
illegal drug use by firefighters, stated "[t]he possession of
contraband drugs does not implicate any aspect of personal
identity which, under prevailing precedent, is entitled to con-
stitutional protection. Validly enacted drug laws put citizens
on notice that this realm is not a private one." 789 F.2d at 839
(citation omitted).

> **B.** **Even assuming that a constitutional right to pri-
> vacy is implicated, NASA's procedures should be
> upheld because they are narrowly tailored to
> meet legitimate state interests.**

Even if the SF-85's questions and Form 42 inquiries impli-
cate a constitutional right to information privacy, the panel
opinion's analysis does not give adequate weight to NASA's
need for this information to ensure that those it trusts with
access to JPL do not pose an unacceptable risk to the safety
and security of the facility. It also fails to appreciate the fact
that NASA's actions are narrowly tailored because the Pri-
vacy Act prevents public disclosure of this information.

> **1.** **Safety and security are legitimate state interests**.

The panel's opinion acknowledges that NASA has a legiti-
mate government interest in conducting background investi-

gations. NASA must "protect its facilities and their occupants
from harm and its information and technology from improper
disclosure." NPR 1600.1, § 4.1.1. In order to "ensure maxi-
mum protection of NASA assets," NASA determined that the
security requirements for contractors should "be equitable
with the employment suitability criteria for NASA Civil Ser-
vice employees" and "be uniformly and consistently applied."
Id. § 4.2.3.

The NACI has two components: the National Agency
Check ("NAC"), which requires the completion of a SF-85,
and the Form 42 Inquiries. Although a standard NAC checks
name and fingerprint databases, the government determined
that this was insufficient to accomplish the security objectives
of HSPD-12 because these database checks would detect only
individuals whose fingerprints are on file at the FBI or indi-
viduals for whom there is a known history with law enforce-
ment or other government agencies. Thus, the government
determined that a NACI was necessary because Form 42's
written inquiries would help verify information on an employ-
ee's SF-85. The information would confirm or raise questions
as to the applicant's trustworthiness and compliance with the
law. The NACI provides a disincentive to using false informa-
tion by subjecting an applicant to a potential perjury charge,
and also creates a means by which the government can readily
verify the validity of information entered onto the SF-85. This
substantially improves the probability of detecting individuals
claiming a false identity.

NASA has a legitimate need to ensure that those it trusts
with access to its facilities do not pose an unacceptable risk
to the safety and security of its costly equipment or its person-
nel. The work performed by the plaintiffs at JPL involves
some of the most sensitive and important technology devel-
oped by NASA, and implicates significant taxpayer money.
Once individuals pass through one of the three main
entrances, they have access to most of the facility and, while
they may not be able to enter areas where classified work is

actually being done, they can travel unescorted to any building on JPL's campus. Also, a NASA identification badge will ordinarily give access to other NASA facilities, and depending on other agencies' practices, access to other federal facilities. Accordingly, NASA must be able to ensure that those given identification badges meet at least minimum security guidelines.

## 2.    NASA's procedures are narrowly tailored

Balancing NASA's legitimate needs for this information with plaintiffs' right to keep this information private requires that we look to the "overall context." See *In re Crawford*, 194 F.3d at 959. Our engagement in the "delicate task of weighing competing interests" requires that we consider such factors as:

> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id.* (quoting *Doe v. Attorney Gen.*, 941 F.2d at 796).

The panel's opinion makes our circuit the first one to find that a background security questionnaire violates a constitutional right of privacy, and diverges from the reasoning of the D.C. and Fifth Circuits, both of which have rejected privacy-based challenges to background checks similar to, or more intrusive than, the one here. In *American Federation of Government Employees*, the D.C. Circuit held that, assuming a constitutional right to privacy even existed, the government "presented sufficiently weighty interests in obtaining the information sought by the questionnaires to justify the intru-

sions into their employees' privacy." 118 F.3d at 793. The background investigations at issue included the more extensive SF-85P Public Trust Positions and the SF-86 Sensitive Questionnaires. Significantly, the D.C. Circuit held that "the individual interest in protecting the privacy of the information sought by the government is significantly less important where the information is collected by the government but not disseminated publicly." *Id.* (noting that "the employees could cite no case in which a court has found a violation of the constitutional right to privacy where the government has collected, but not disseminated, the information").

The Fifth Circuit similarly found that the government employees in that case had no reasonable expectation of privacy in keeping confidential the information requested in the SF-85P Questionnaire. *See Nat'l Treasury Employees Union*, 25 F.3d at 244. The Fifth Circuit observed that the questionnaire requires the employees "only to disclose information to the [government], as their employer — not to anyone else, and certainly not to the public." *Id.*

The panel's opinion disregards the distinction between a privacy interest in avoiding *collection* of information by the government and an interest in avoiding *disclosure* by the government — a distinction recognized by both the D.C. and Fifth Circuits. This distinction is critical to this case because the government has provided adequate safeguards to ensure that the information is not disseminated to the public. The Privacy Act protects the information collected from public and/or unauthorized access and disclosure. *See* 5 U.S.C. § 552a(b). Courts have routinely held that security provisions designed to prevent the public disclosure of protected information weigh heavily in favor of the government. *See Whalen*, 429 U.S. at 601-02 (finding that extensive security procedures required by statute and regulation substantially reduce employees' privacy interests); *Lawall*, 307 F.3d at 790 (statute contained adequate protection to prevent unauthorized disclosure of abortion by minor female). In *American Federa-*

*tion of Government Employees*, the D.C. Circuit found it significant that the Privacy Act prohibited public dissemination of the information obtained in personnel background investigations. 118 F.3d at 793. The court was satisfied that the protections of the Privacy Act substantially reduced the employees' privacy interests. *Id.* at 793; *see also Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 118 (3d Cir. 1987) (holding "complete absence of comparable protection of the confidential information to be disclosed in response to the . . . questionnaire" was a significant factor in finding violation of right of privacy).

In addition to Privacy Act protection, FIPS 201-1 establishes detailed privacy requirements governing the collection and retention of information, including (1) the assignment of a senior agency official to oversee privacy-related matters; (2) a Privacy Impact Assessment, ensuring that only personnel with a legitimate need for access to personal information are authorized to access this information; (3) continuous auditing of compliance; (4) use of an electromagnetically opaque sleeve or other technology to protect against any unauthorized contactless access to personal information; and (5) disclosure to applicants of the intended uses and privacy implications of the information submitted in order to obtain credentials. *See* FIPS 201-1, § 2.4. NASA also issued an Interim Directive augmenting NPR 1600.1, which details how "all [a]pplicants will have their information protected by applicable provision of the Privacy Act." The Privacy Act, FIPS 201-1, and NASA's Interim Directive ensure that collected information will not be disclosed to the public.

The panel, however, is concerned that Form 42's "open-ended questions appear to range far beyond the scope of the legitimate state interests that the government has proposed." *Nelson II*, 530 F.3d at 881. But an effective investigation of an applicant generally requires asking open-ended questions to allow investigators some flexibility to follow up on relevant leads. Instead, the panel's opinion would second-guess

determinations regarding suitability for federal employment and the security of federal institutions that are best left to the Executive Branch.

In assessing whether NASA's actions are narrowly tailored, we look at the nature of the inquiry and ask whether it is an appropriate matter of inquiry based on the legitimate concerns raised by the government. *See Thorne*, 726 F.2d at 469. Form 42's questions to designated references are limited to "additional information which [they] feel may have a bearing on this person's suitability for government employment or a security clearance." In *American Federation of Government Employees*, the D.C. Circuit found a release form in a background investigation that authorized the government to collect "any information relating to my activities" sufficiently narrowly tailored because the Privacy Act limits the collection to "relevant" information in order to determine the fitness of an individual. 118 F.3d at 789, 794. The court observed that "the Privacy Act requires that an agency 'maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President.' " *Id.* at 794 (quoting 5 U.S.C. § 552a(e)(1)). The scope of Form 42's questions asking for information "bearing on this person's suitability for government employment or a security clearance" is similar to the release form in *American Federation of Government Employees*.

Finally, the panel concludes that the SF-85's request for disclosure of "any treatment or counseling received for illegal drug use would presumably lessen the government's concerns regarding the underlying activity," and thus, does not sufficiently demonstrate a legitimate state interest. *Nelson II*, 530 F.3d at 879. As discussed above, a government worker's drug use history cannot be kept from the government. *See Nat'l Treasury Employees Union*, 25 F.3d at 243. If a government worker's illegal drug use history is not entitled to constitutional protection, as the panel agrees, I do not see how a ques-

tion regarding whether the applicant has received any treatment or counseling does not concern a legitimate state interest, especially when it provides a more complete picture of an applicant's acknowledged drug use history. Of course, successful counseling might alleviate security concerns, but this supports rather than detracts from the inquiry's relevance and legitimacy. Given that the government may legitimately inquire as to an employee's illegal drug use, it makes little sense to prohibit the government from asking about an employee's treatment or counseling for drug use, which is necessary for a complete evaluation of the effect of the employee's drug use. The panel's opinion draws an arbitrary line, one which severely hampers the government's ability to secure its facilities.

## III. Conclusion

The panel's opinion sharply curtails the degree to which the government can protect the safety and security of federal facilities. It significantly expands the constitutional right to informational privacy and puts the Ninth Circuit at odds with other circuits that have considered the right to informational privacy with respect to personnel background investigations. For these reasons, I respectfully dissent from the denial of rehearing en banc.

---

KLEINFELD, Circuit Judge, with whom CALLAHAN and BEA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join in Judge Callahan's dissent from denial of rehearing en banc. Judge Callahan focuses on the drug treatment question and other inquiries to the applicant. I write to supplement her discussion of the other government conduct the panel held likely to be unconstitutional — the inquiries to references, past employers, landlords, and schools.

The panel characterizes as "the most problematic aspect of the government's investigation — the open-ended Form 42 inquiries."[1] Almost 1,000,000 of these inquiries are sent out every year, not just for people applying for jobs at the Jet Propulsion Lab managing space missions and protecting national security on secret space matters, but also for most other government jobs.[2] The panel opinion is likely to impair national security by enjoining reasonable reference checks on applicants for federal government functions. The panel's injunction failed to consider this public interest factor, contrary to the Supreme Court's recent admonition that "*consideration of the public interest*" is mandatory "in assessing the propriety of any injunctive relief."[3]

The panel forbids the government from making the inquiries it has been making for decades, and from doing what any sensible private employer would do.[4] The panel's concern is that the "open-ended questions" — any adverse information regarding financial integrity, drug and alcohol abuse, mental and emotional stability, general behavior and conduct, and other matters — go beyond the government's legitimate security needs. The panel says that "highly personal information" is likely to come back when this form is sent to refer-

---

[1]*Nelson v. NASA*, 530 F.3d 865, 877 (9th Cir. 2008).

[2]*See* Exec. Order No. 10,450 § 3(a), 18 Fed. Reg. 2489 (Apr. 29, 1953), *reprinted as amended in* 5 U.S.C. § 7311 app. at 78 (2006) ("The appointment of each civilian officer or employee *in any department or agency of the Government* shall be made subject to . . . . [I]n no event shall the investigation include less than . . . written inquiries to . . . former employers and supervisors, references, and schools attended by the person under investigation.") (emphasis added); Submission for OMB Review, 70 Fed. Reg. 61,320, 61,320 (Oct. 21, 2005) ("Approximately 980,000 INV 42 inquiries are sent to individuals annually. The INV 42 takes approximately five minutes to complete.").

[3]*Winter v. NRDC*, 129 S. Ct. 365, 381 (2008), *rev'g* 518 F.3d 658 (9th Cir.) (emphasis added).

[4]Exec. Order No. 10,450, 18 Fed. Reg. 2489 (Apr. 29, 1953), *reprinted as amended in* 5 U.S.C. § 7311 app. at 77-80 (2006).

ences, former employers, and landlords.[5] I disagree. What these categories of people know ought to be subject to inquiry.

First, what would references, past employers, and landlords know that is too "highly personal" for the government to know when it is hiring someone?[6] There is no citation for the panel's claim that "[t]he highly personal information that the government seeks to uncover through the Form 42 inquiries is protected by the right to privacy, whether it is obtained from third parties or from the applicant directly."[7] A landlord, unlike a doctor or lawyer, does not obtain genuinely private medical or legal confidences, after all. That is why past employers, unlike doctors or lawyers, have a privilege in defamation and invasion of privacy law.[8] A past employer can (and should) tell a prospective employer if the applicant stole money, came in late and hungover on Mondays, or wound up in jail after a drug bust, yet the majority would treat this as a secret not to be disclosed to the Jet Propulsion Lab or any government agency hiring for a civil service position.

Other circuits have rejected the panel's position. The District of Columbia Circuit held that collection of information does not raise the concerns that dissemination would, noting that "the employees could cite no case in which a court has found a violation of the constitutional right to privacy where the government has *collected*, but not *disseminated*, the information."[9] Likewise the Fifth Circuit.[10] This case concerns only collection of information, not dissemination.

---

[5]*Nelson*, 530 F.3d at 879-82.

[6]*See United States v. Jacobsen*, 466 U.S. 109, 117 (1984) ("[W]hen an individual reveals private information to another, he assumes the risk that his confidant will reveal that information . . . .").

[7]*Nelson*, 530 F.3d at 880 n.5.

[8]*See* Restatement (Second) of Torts, § 652G (1977); *id.* § 595 cmt. i (noting conditional privilege to make a defamatory statement regarding former employee, despite any putative invasion of privacy).

[9]*Am. Fed. of Gov't Employees v. HUD*, 118 F.3d 786, 793 (D.C. Cir. 1997) (emphasis added).

[10]*Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d

The panel appears to be especially concerned with the "open-ended" inquiry into "any other adverse matters." The panel cites no authority, and gives no good reason, for rejecting these inquiries. When a prospective employer calls a past employer, it is exceedingly difficult to find out bad things, because people usually do not like to allege them without absolute proof (and because of potential liability and retaliation). The prospective employer does not know what bad things to ask about until something comes up in response to the open-ended questions. The prospective employer must smoke out negative information with open-ended broad questions and is lucky to get a glimmer. The answers to open-ended questions are not infrequently revelatory and surprising.[11]

Most of us do not hire law clerks and secretaries without talking to professors and past employers and asking some general questions about what they are like. It is hard to imagine an espresso stand hiring a barista without some open-ended questions to throw light on his reliability, honesty with cash, customer service, and ability to get along with coworkers and supervisors. I doubt if a person cleaning homes for a living hires an assistant without first finding out some-

---

237, 244 (5th Cir. 1994) ("[G]iven that the information collected by the questionnaire will not be *publically disclosed*, we hold that the individual employees represented in the present case have no reasonable expectation that they can keep confidential from their government employer the information requested . . . .") (emphasis added).

[11]None more so than *People v. Hill*, 452 P.2d 329, 337 (Cal. 1969), where an interviewee answered the question "is there anything else you want to tell us" by admitting a previous burglary, which made him a suspect, later convicted, in a home-invasion murder. *See also* Shannon Dininny, *Washington Prepares for First Execution since 2001*, Associated Press, Mar. 9, 2009 (suspect in a California attempted murder answers the same question by admitting a murder in Washington, for which he was later convicted and currently faces the death penalty); *cf. United States v. King*, 34 C.M.R. 7, 9 (C.M.A. 1963) ("The Air Policeman 'more or less' found out 'what the story was' when he asked King if there was 'anything you want to tell me.' ").

thing about the assistant. Without open-ended questions, it is hard to know what potential problems might need an explanation. Of course some answers will be irrelevant or silly. But without the open-ended questions, any employer gets stuck with people who should not have been hired, and even, occasionally, people who are dangerous.

Under the panel opinion, our federal government cannot exercise the reasonable care an espresso stand or clothing store exercises when hiring. No revival of McCarthyism is threatened by allowing as much inquiry for hiring a Jet Propulsion Lab engineer as a barista.

---

Chief Judge KOZINSKI, with whom Judges KLEINFELD and BEA join, dissenting from the denial of rehearing en banc:

Is there a constitutional right to informational privacy? Thirty-two Terms ago, the Supreme Court hinted that there might be and has never said another word about it. *See Whalen* v. *Roe*, 429 U.S. 589, 599 (1977) (alluding to "the individual interest in avoiding disclosure of personal matters"), and *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 457 (1977) (quoting the above phrase from *Whalen*). With no Supreme Court guidance except this opaque fragment, the courts of appeals have been left to develop the contours of this free-floating privacy guarantee on their own. It's a bit like building a dinosaur from a jawbone or a skull fragment, and the result looks more like a turducken. We have a grab-bag of cases on specific issues, but no theory as to what this right (if it exists) is all about. The result in each case seems to turn more on instinct than on any overarching principle.

One important function of the en banc process is to synthesize the accumulated experience of panels into firmer guide-

posts. We ought to have taken this case en banc for precisely that reason. Unless and until the Supreme Court again weighs in on this topic, only an en banc court can trim the hedges, correct what now appear to be missteps and give the force of law to those distinctions that experience has revealed to be important.

**1.** One such distinction is between mere government *collection* of information and the government's *disclosure* of private information to the public. *Whalen* involved the latter: patients who feared public disclosure of their prescription records. Many of the cases in our circuit fall into this mold. In *Tucson Woman's Clinic* v. *Eden*, we held that women had a right not to have the government disclose their pregnancy records to a third-party contractor. 379 F.3d 531, 553 (9th Cir. 2004). *In re Crawford* featured a bankruptcy preparer who didn't want his Social Security number published. 194 F.3d 954 (9th Cir. 1999). But in other cases, such as the one now before us, we have sustained informational privacy claims without any allegations that the government might publish what it learned. *See, e.g.*, *Norman-Bloodsaw* v. *Lawrence Berkeley Laboratory*, 135 F.3d 1260 (9th Cir. 1998).

The distinction matters. Government acquisition of information is already regulated by express constitutional provisions, particularly those in the Fourth, Fifth and Sixth Amendments. How can the creation of new constitutional constraints be squared with the teachings of *Medina* v. *California*, which cautioned against discovering protections in the Due Process Clause in areas where the "Bill of Rights speaks in explicit terms?" 505 U.S. 437, 443 (1992). Our cases, including this one, neither address nor acknowledge this problem. Yet limiting the government's ability to gather information has very serious implications, as Judge Callahan's dissent illustrates.

**2.** There's also an important distinction between disclosures that the target may refuse and those imposed regardless of his

consent. The latter is inherently more invasive. *Nixon* is instructive: There, the former president was required by law to submit his papers for screening by the National Archives. This requirement wasn't imposed as a condition on some benefit or job opportunity; rather, it was imposed outright under penalty of law. 433 U.S. at 429. Though Nixon was unsuccessful, it wasn't because his claim wasn't found to be cognizable; the public interest was held to outweigh his privacy. In *Whalen*, the only way for the patients to avoid having their prescription records turned over was to give up needed pharmaceuticals. Our cases sometimes fit comfortably in this mold: What was so creepy about the medical tests in *Norman-Bloodsaw*, for example, was the sneaky way they were done without the subjects' knowledge or consent. 135 F.3d at 1269.

It strikes me as quite a different case when the government seeks to collect information directly from persons who are free to say no. The plaintiffs here had a simple way to keep their private dealings private: They could have declined to fill out the forms, provided no references and sought other employment. Does being asked to disclose information one would prefer to keep private, in order to keep a government job to which one has no particular entitlement, amount to a constitutional violation? If the answer is yes, then the government commits all manner of constitutional violations on tax returns, government contract bids, loan qualification forms, and thousands of job applications that are routinely filled out every day.

**3.** There is also a distinction, recognized by some of our sister circuits, between information that pertains to a fundamental right, such as the right to an abortion or contraception, *see, e.g.*, *Bloch* v. *Ribar*, 156 F.3d 673, 684 (6th Cir. 1998), and a free-standing right not to have the world know bad things about you. The former kind of right seems to stand on far sounder constitutional footing than the latter.

**4.** Consider also the contrast between investigating a subject by digging through his bank records or medical files, and contacting third parties to find out what they know about him. One's pregnancy status (perhaps known to no one), as in *Norman-Bloodsaw*, or the need for certain pharmaceuticals, as in *Whalen*, is private precisely because one has been careful not to disclose it. But one's privacy interest ought to wane the more widely the information is known. The Supreme Court has made a related point about the Fourth Amendment: Individuals lack a reasonable expectation of privacy in information that they share voluntarily with others. *See United States* v. *Miller*, 425 U.S. 435, 443 (1976).

Does one really have a free-standing constitutional right to withhold from the government information that others in the community are aware of? I don't think so. How then can it be constitutionally impermissible for the government to ask a subject's friends, family and neighbors what they know about him? Surely there's no constitutional right to have the state be the last to know.

**5.** A final distinction that emerges from the cases is between the government's different functions as enforcer of the laws and as employer. In *Whalen*, the government was acting as the former, collecting prescription records to aid later investigation of unlawful distribution. 589 U.S. at 591-92. Similarly, in *Tucson Woman's Clinic*, the government was ostensibly scooping up patient information to protect the public health. 379 F.3d at 536-37. Here, as Judge Kleinfeld illustrates in his dissent, the government is simply acting as any other employer might: collecting information for its own purposes to make employment decisions.

If a right to informational privacy exists at all, *but see AFL-CIO* v. *Department of Housing and Urban Development*, 118 F.3d 786, 791, 793 (D.C. Cir. 1997), it would be far more likely to apply when the government is exercising its sovereign authority than when it is monitoring its own employees.

While I can think of many reasons to worry when the government seeks to uncover private information using the special powers that private entities lack, it's far less obvious why it should be hamstrung in ensuring the security and integrity of its operations in ways that private employers are not. The delicate knowledge handled by thousands of federal employees seems as worthy of protection as the formula for Coca-Cola.

* * *

As we have recognized elsewhere, there are circumstances when a well-worn doctrine can grow into "a vexing thicket of precedent" that then becomes "difficult for litigants to follow and for district courts—and ourselves—to apply with consistency." *United States* v. *Heredia*, 483 F.3d 913, 919 (9th Cir. 2007) (en banc). The back-and-forth between the panel and my dissenting colleagues illustrates that we have reached this point with the doctrine of informational privacy. Though I am sympathetic to the arguments of my dissenting colleagues, it's not clear that the panel has misapplied circuit law; when the law is so subjective and amorphous, it's difficult to know exactly what a misapplication might look like.

It's time to clear the brush. An en banc court is the only practical way we have to do it. We didn't undertake that chore today, but we'll have to sooner or later, unless the Supreme Court should intervene.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.